IN THE SUPREME COURT OF NORTH CAROLINA

No. 201PA12-2

MARGARET DICKSON, ALICIA CHISOLM, ETHEL CLARK, MATTHEW A. McLEAN, MELISSA LEE ROLLIZO, C. DAVID GANTT, VALERIA TRUITT, ALICE GRAHAM UNDERHILL, ARMIN JANCIS, REBECCA JUDGE, ZETTIE WILLIAMS, TRACEY BURNS-VANN, LAWRENCE CAMPBELL, ROBINSON O. EVERETT, JR., LINDA GARROU, HAYES McNEILL, JIM SHAW, SIDNEY E. DUNSTON, ALMA ADAMS, R. STEVE BOWDEN, JASON EDWARD COLEY, KARL BERTRAND FIELDS, PAMLYN STUBBS, DON VAUGHAN, BOB ETHERIDGE, GEORGE GRAHAM, JR., THOMAS M. CHUMLEY, AISHA DEW, GENEAL GREGORY, VILMA LEAKE, RODNEY W. MOORE, BRENDA MARTIN STEVENSON, JANE WHITLEY, I.T. ("TIM") VALENTINE, LOIS WATKINS, RICHARD JOYNER, MELVIN C. McLAWHORN, RANDALL S. JONES, BOBBY CHARLES TOWNSEND, ALBERT KIRBY, TERRENCE WILLIAMS, NORMAN C. CAMP, MARY F. POOLE, STEPHEN T. SMITH, PHILIP A. BADDOUR, and DOUGLAS A. WILSON

v.

ROBERT RUCHO, in his official capacity only as the Chairman of the North Carolina Senate Redistricting Committee; DAVID LEWIS, in his official capacity only as the Chairman of the North Carolina House of Representatives Redistricting Committee; NELSON DOLLAR, in his official capacity only as the Co-Chairman of the North Carolina House of Representatives Redistricting Committee; JERRY DOCKHAM, in his official capacity only as the Co-Chairman of the North Carolina House of Representatives Redistricting Committee; PHILIP E. BERGER, in his official capacity only as the President Pro Tempore of the North Carolina Senate; THOM TILLIS, in his official capacity only as the Speaker of the North Carolina House of Representatives; THE STATE BOARD OF ELECTIONS; and THE STATE OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE OF BRANCHES OF THE NAACP, LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, DEMOCRACY NORTH CAROLINA, NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE, REVA McNAIR, MATTHEW DAVIS, TRESSIE STANTON, ANNE WILSON, SHARON HIGHTOWER, KAY BRANDON, GOLDIE WELLS, GRAY NEWMAN, YVONNE STAFFORD, ROBERT DAWKINS, SARA STOHLER, HUGH STOHLER, OCTAVIA RAINEY, CHARLES HODGE, MARSHALL HARDY, MARTHA GARDENHIGHT, BEN TAYLOR, KEITH RIVERS, ROMALLUS O. MURPHY, CARL WHITE, ROSA BRODIE, HERMAN LEWIS, CLARENCE ALBERT, EVESTER BAILEY, ALBERT BROWN, BENJAMIN LANIER, GILBERT VAUGHN, AVIE LESTER, THEODORE MUCHITENI, WILLIAM HOBBS, JIMMIE RAY HAWKINS, HORACE P. BULLOCK, ROBERTA

WADDLE, CHRISTINA DAVIS-McCOY, JAMES OLIVER WILLIAMS, MARGARET SPEED, LARRY LAVERNE BROOKS, CAROLYN S. ALLEN, WALTER ROGERS, SR., SHAWN MEACHEM, MARY GREEN BONAPARTE, SAMUEL LOVE, COURTNEY PATTERSON, WILLIE O. SINCLAIR, CARDES HENRY BROWN, JR., and JANE STEPHENS

v.

THE STATE OF NORTH CAROLINA; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; THOM TILLIS, in his official capacity as Speaker of the North Carolina House of Representatives; and PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate

Appeal pursuant to N.C.G.S. § 120-2.5 from orders entered on 6 February 2012 and 8 July 2013 by a three-judge panel of the Superior Court, Wake County appointed by the Chief Justice under N.C.G.S. § 1-267.1. Heard in the Supreme Court on 6 January 2014.

> *Poyner Spruill LLP, by Edwin M. Speas, Jr., John W. O'Hale, and Caroline P. Mackie, for Dickson plaintiff-appellants; and Southern Coalition for Social Justice, by Anita S. Earls and Allison Riggs, and Tin Fulton Walker & Owen, PLLC, by Adam Stein, for NC NAACP plaintiff-appellants.*

> *Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Thomas A. Farr and Phillip J. Strach, for legislative defendant-appellees; and Roy Cooper, Attorney General, by Alexander McC. Peters, Special Deputy Attorney General, for all defendant-appellees.*

> *Jenner & Block LLP, by Paul M. Smith, pro hac vice, Jessica Ring Amunson, pro hac vice, and Michelle R. Singer, pro hac vice; and Smith Moore Leatherwood LLP, by Mark Anderson Finkelstein and Matthew Nis Leerberg, for Election Law Professors Guy-Uriel Charles, Gilda R. Daniels, Lani Guinier, Samuel Issacharoff, Justin Levitt, Janai S. Nelson, Spencer Overton, Richard H. Pildes, and Franita Tolson, amici curiae.*

> *H. Jefferson Powell for North Carolina Law Professors Michael Curtis, Walter Dellinger, William P. Marshall, and H. Jefferson Powell, amici curiae.*

*Terry Smith, pro hac vice, and Ferguson, Chambers & Sumter, P.A., by Geraldine Sumter, for North Carolina Legislative Black Caucus, amicus curiae.*

EDMUNDS, Justice.

Following the 2010 Decennial Census, the General Assembly of North Carolina enacted redistricting plans for the North Carolina Senate and House of Representatives, and for the North Carolina districts for the United States House of Representatives. Plaintiffs challenge the legality of these plans, arguing that they violate the constitutions of the United States and of North Carolina, controlling federal statutes, and applicable decisions of the Supreme Court of the United States and the Supreme Court of North Carolina. The three-judge panel reviewing the plans unanimously concluded that the General Assembly applied traditional and permissible redistricting principles to achieve partisan advantage and that no constitutional violations resulted. After a careful and exhaustive review of the record in this case and the pertinent law, we conclude that, as to the twenty-six districts deliberately drawn to comply with the federal Voting Rights Act of 1965, the trial court erred when it applied strict scrutiny prematurely. However, plaintiffs were not prejudiced because even if strict scrutiny is not appropriate, these districts survive this most demanding level of review. As to the remaining challenged districts, we affirm the ruling of the trial court.

I. Procedural Background

The Constitution of North Carolina requires decennial redistricting of the North Carolina Senate and North Carolina House of Representatives, subject to several specific requirements. The General Assembly is directed to revise the districts and apportion Representatives and Senators among those districts. N.C. Const. art. II, §§ 3, 5. Similarly, consistent with the requirements of the Constitution of the United States, the General Assembly establishes North Carolina's districts for the United States House of Representatives after every decennial census. U.S. Const. art. I, §§ 2, 4; 2 U.S.C. §§ 2a, 2c (2012).

Following the census conducted with a date of 1 April 2010, leaders of the North Carolina House of Representatives and the North Carolina Senate independently appointed redistricting committees. Each committee was responsible for recommending a plan applicable to its own chamber, while the two committees jointly were charged with preparing a redistricting plan for the United States House of Representatives North Carolina districts. These committees sought information and suggestions from numerous sources, including the North Carolina Legislative Black Caucus and the North Carolina delegation to the United States Congress. In addition, these committees solicited input from various constituencies; invited public comment and conducted public hearings in multiple counties, including twenty-four of the forty counties then covered by section 5 of the Voting Rights Act

of 1965 (hereinafter "the Voting Rights Act" or "VRA");[1] heard both lay and expert testimony regarding such matters as racially polarized voting; solicited and received advice from the University of North Carolina School of Government; commissioned reports from independent experts to fill gaps in the evidence; and considered written submissions.

The General Assembly convened on 25 July 2011 to deliberate the redistricting plans drawn by the House and Senate committees. That same day, alternative maps were submitted by leaders of the Democratic Party and by the Legislative Black Caucus. On 27 July, the General Assembly ratified the 2011 North Carolina Senate redistricting plan and the 2011 plan for the federal House of Representatives districts. On 28 July, the General Assembly ratified the 2011 North Carolina House of Representatives redistricting plan. On 2 September 2011, the three plans were submitted to the United States Department of Justice for preclearance under section 5 of the Voting Rights Act, and preclearance was received on 1 November 2011.[2] Also on 2 September, a suit seeking preclearance was filed in the United States District Court for the District of Columbia. That action was dismissed on 8 November 2011.

---

[1] Effective 1 September 2014, section 5 of the VRA is codified at 52 U.S.C.S. § 10304 (LexisNexis 2014). Section 5 previously was codified at 42 U.S.C.S. § 1973c.

[2] Because a software glitch caused the State's initial submission to the Department of Justice to be incomplete, the General Assembly enacted curative statutes on 7 November 2011. These statutes were precleared on 8 December 2011.

On 3 November 2011, Margaret Dickson and forty-five other registered voters filed a complaint, seeking to have the three redistricting plans declared invalid on both constitutional and statutory grounds. These plaintiffs filed an amended complaint on 12 December 2011. On 4 November 2011, the North Carolina State Conference of Branches of the NAACP joined by three organizations and forty-six individuals filed a complaint seeking similar relief. These plaintiffs filed an amended complaint on 9 December 2011. Following the filing of the original complaints, the Chief Justice of the Supreme Court of North Carolina appointed a panel of three superior court judges to hear these actions, pursuant to N.C.G.S. § 1-267.1. On 19 December 2011, the three-judge panel ("the trial court") consolidated both cases for all purposes.

On 6 February 2012, the trial court allowed in part and denied in part defendants' motion to dismiss. Plaintiffs filed a motion for partial summary judgment on 5 October 2012, and defendants filed a motion for summary judgment on 10 December 2012. The trial court heard arguments on these motions on 25 and 26 February 2013.

While a ruling on the motions for summary judgment was pending, the trial court issued an order determining that genuine issues of material fact existed as to two issues that could not be resolved by summary judgment. Accordingly, the court ordered a trial on these two issues, which it identified as:

> A. Assuming application of a strict scrutiny standard and, in considering whether the Enacted Plans were

narrowly tailored, was each challenged Voting Rights Act ("VRA") district drawn in a place where a remedy or potential remedy for racially polarized voting was reasonable for purposes of preclearance or protection of the State from vote dilution claims under the Constitution or under § 2 of the VRA?

B. For six specific districts (Senate Districts 31 and 32, House Districts 51 and 54 and Congressional Districts 4 and 12 – none of which is identified as a VRA district), what was the predominant factor in the drawing of those districts?

The court conducted the trial on 4 and 5 June 2013. On 8 July 2013, the trial court issued its unanimous "Judgment and Memorandum of Decision" denying plaintiffs' motion for partial summary judgment and entering summary judgment for defendants on all remaining claims. Plaintiffs entered timely notice of appeal pursuant to N.C.G.S. § 120-2.5.

II. Plaintiffs' Federal Claims

We begin by considering plaintiffs' claims brought under federal law. If a redistricting plan does not satisfy federal requirements, it fails even if it is consistent with the law of North Carolina. *See* U.S. Const. art. VI, § 2; N.C. Const. art. I, § 3. Plaintiffs argued first to the trial court, and now to us, that the redistricting plans violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States because they impermissibly classify individuals based upon their race. In other words, plaintiffs contend that the redistricting plans constitute impermissible racial gerrymandering that has denied them equal protection under the law.

A.  Standards Applicable upon Review

A court considering allegations of racial gerrymandering first must determine the appropriate standard of review.  Strict scrutiny, the highest tier of review, applies "when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *White v. Pate*, 308 N.C. 759, 766, 304 S.E.2d 199, 204 (1983) (citations omitted). "Race is unquestionably a 'suspect class,' " *Phelps v. Phelps*, 337 N.C. 344, 353, 446 S.E.2d 17, 23 (1994), and if a court finds that race is the "predominant, overriding factor" behind the General Assembly's plans, the plans must satisfy strict scrutiny to survive, *Miller v. Johnson*, 515 U.S. 900, 920, 115 S. Ct. 2475, 2490, 132 L. Ed. 2d 762, 782 (1995).  "Under strict scrutiny [review], a challenged governmental action is unconstitutional if the State cannot establish that it is narrowly tailored to advance a compelling governmental interest."  *Stephenson v. Bartlett*, 355 N.C. 354, 377, 562 S.E.2d 377, 393 (2002) (hereinafter "*Stephenson I*") (citation omitted).  If, on the other hand, the plans are not predominantly motivated by improper racial considerations, the court defaults to the rational basis test.  *See Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1, 12 (1992) ("[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification" satisfy rational basis review.).  Under rational basis review, "[t]he general rule is

that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313, 320 (1985) (citations omitted).

A party challenging a redistricting plan has the burden of establishing that race was the predominant motive behind the state legislature's action. *Miller*, 515 U.S. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779-80. In *Miller*, the Supreme Court stated that

> [t]he plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a State can "defeat a claim that a district has been gerrymandered on racial lines."

*Id.* (quoting *Shaw v. Reno*, 509 U.S. 630, 647, 113 S. Ct. 2816, 2827, 125 L. Ed. 2d 511, 529 (1993) (hereinafter "*Shaw I*")).

As a court considers which standard of review is appropriate, it should be mindful of the Supreme Court's observation that "courts must 'exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on

the basis of race.' " *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S. Ct. 1452, 1458, 149 L. Ed. 2d 430, 443 (2001) (hereinafter "*Cromartie II*") (quoting *Miller*, 515 U.S. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779 (emphasis added)). At least three factors lie behind this admonition. First, in light of the interplay detailed below between the Fourteenth Amendment, which virtually forbids consideration of race, and the VRA, which requires consideration of race, the Supreme Court has acknowledged that the existence of legislative consciousness of race while redistricting does not automatically render redistricting plans unconstitutional. *Miller*, 515 U.S. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."); *see also Shaw I*, 509 U.S. at 646, 113 S. Ct. at 2826, 125 L. Ed. 2d at 528 ("[T]he legislature always is *aware* of race when it draws district lines . . . . That sort of race consciousness does not lead inevitably to impermissible race discrimination."). Second, the Supreme Court has recognized the importance of States' own traditional districting principles, holding that States can adhere to them without being subject to strict scrutiny so long as those principles are not subordinated to race. *Bush v. Vera*, 517 U.S. 952, 978, 116 S. Ct. 1941, 1961, 135 L. Ed. 2d 248, 269 (1996) (plurality). Finally, the Supreme Court has accepted that some degree of deference is due in light of the difficulties facing state legislatures when reconciling conflicting legal responsibilities. *Id.* at 1038, 116 S. Ct. at 1991, 135 L. Ed. 2d at 308 (Stevens,

Ginsburg & Breyer, JJ., dissenting); *see also Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2014 WL 5019686, at \*6-7 (E.D. Va. Oct. 7, 2014) (determination by three-judge court in accordance with 52 U.S.C.S. § 10304(2)) (recognizing that redistricting is "possibly 'the most difficult task a legislative body ever undertakes' " (citation omitted)).

A court's determination of the predominant motive underlying a redistricting plan is factual in nature. *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S. Ct. 1545, 1550, 143 L. Ed. 2d 731, 740 (1999) (hereinafter "*Cromartie I*" (citations omitted)). Factual findings are binding on appeal if not challenged at trial or on appeal, *e.g.*, *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991), or if supported by competent evidence found by the trial judge, *e.g.*, *In re Estate of Trogdon*, 330 N.C. 143, 147-48, 409 S.E.2d 897, 900 (1991). Conclusions of law are reviewed de novo. *E.g.*, *N.C. Farm Bureau Mut. Ins. Co. v. Cully's Motorcross Park, Inc.*, 366 N.C. 505, 512, 742 S.E.2d 781, 786 (2013) (citation omitted). Here, of the thirty challenged House, Senate, and Congressional districts, the trial court concluded that twenty-six were predominantly motivated by race and thus subject to strict scrutiny review. The trial court concluded that the remaining four challenged districts were not predominantly motivated by race and thus were subject to rational basis review. We consider each group in turn.

B. The VRA Districts

We turn first to the twenty-six districts that the trial court subjected to strict scrutiny. As to these districts, the trial court reached two significant conclusions. First, the court unanimously found that "it is undisputed that the General Assembly intended to create 26 of the challenged districts to be 'Voting Rights Act districts' " that would include a Total Black Voting Age Population of at least fifty percent. This unchallenged finding of fact is binding on us. *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. The trial court then reached a second unanimous conclusion that drawing such districts "necessarily requires the drafters of districts to classify residents by race," that the "shape, location and racial composition of each VRA district was predominantly determined by a racial objective," and that the process of creating such districts resulted in "a racial classification sufficient to trigger the application of strict scrutiny as a matter of law." Although this second determination by the trial court is neither purely factual nor purely legal, we are mindful that federal precedent cited above instructs that the General Assembly's consideration of race to the degree necessary to comply with section 2 does not rise to the level of a "predominant motive" as a matter of course. Accordingly, before reviewing the trial court's application of strict scrutiny, we believe it necessary to review its conclusion as to the General Assembly's predominant motive.

1. Predominant Motive

The challenges faced by the General Assembly while redistricting are easy to express but persistently difficult to resolve. The Fourteenth Amendment, by

guaranteeing equal protection for all citizens regardless of race, virtually prohibits consideration of race during redistricting. U.S. Const. amend. XIV, § 1. Yet the Voting Rights Act, passed "to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude,' " *Voinovich v. Quilter*, 507 U.S. 146, 152, 113 S. Ct. 1149, 1154-55, 122 L. Ed. 2d 500, 510 (1993) (alteration in original) (citations omitted), specifically requires consideration of race. For instance, section 2 "prohibits the imposition of any electoral practice or procedure that 'results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color.' " *Id.* at 152, 113 S. Ct. at 1155, 122 L. Ed. 2d at 510 (quoting 42 U.S.C. § 1973(a) (alteration in original) (effective 1 September 2014, recodified as 52 U.S.C.S. § 10301(a) (LexisNexis 2014)). At the same time, the General Assembly must ensure that each district complies with federal and state "one-person, one-vote" standards, *see* N.C. Const. art. II, §§ 3(1), 5(1); *Reynolds v. Sims*, 377 U.S. 533, 565-66, 84 S. Ct. 1362, 1383-85, 12 L. Ed. 2d 506, 529-30 (1964); *Baker v. Carr*, 369 U.S. 186, 207-08, 82 S. Ct. 691, 705, 7 L. Ed. 2d 663, 680 (1962) and that, to the greatest extent allowed under federal law, the redistricting plans comply with the Whole County Provision of our state constitution, *Stephenson I*, 355 N.C. at 382-84, 562 S.E.2d at 395-97. Moreover, the Supreme Court of the United States has acknowledged other legitimate considerations, such as compactness, contiguity, and respect for political subdivisions, *see Miller*, 515 U.S. at 916, 115 S. Ct. at 2488, 132

L. Ed. 2d at 780; *Shaw I*, 509 U.S. at 646, 113 S. Ct. 2826, 125 L. Ed. 2d at 528; *Reynolds*, 377 U.S. at 578, 84 S. Ct. at 1390, 12 L. Ed. 2d at 537; political advantage, *see Cromartie I*, 526 U.S. at 551, 119 S. Ct. at 1551, 143 L. Ed. 2d at 741; and accommodation of incumbents, *see Karcher v. Daggett*, 462 U.S. 725, 740, 103 S. Ct. 2653, 2663, 77 L. Ed. 2d 133, 147 (1983). Thus, "[t]he courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, 515 U.S. at 915-16, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779.

Despite this cat's cradle of factors facing the General Assembly, the trial court found that no factual inquiry was required regarding the General Assembly's predominant motivation in forming the twenty-six VRA districts beyond the General Assembly's concession that the districts were drafted to be VRA-compliant. In light of the many other considerations potentially in play, we do not believe that this concession established that race *ipso facto* was the predominant motive driving the General Assembly. Because of the trial court's truncated findings of fact on this issue, we do not know which other factors may have influenced the creation and shape of these twenty-six districts and the extent of any such influence. As a result, we do not know whether race fairly can be described as the predominant factor in the formation of these districts and whether, in turn, strict scrutiny was the appropriate standard of review. Moreover, in future cases such an assumption—that deliberate creation of VRA-compliant districts equates to race as the

predominant motive in creating the districts—may well shortcut the fact-finding process at which trial courts excel, resulting in scanty records on appeal. Accordingly, we hold that the trial court erred in concluding as a matter of law that, just because the twenty-six districts were created to be VRA-compliant, the General Assembly was motivated predominantly by race.

Nonetheless, this error is not fatal and does not invalidate the trial court's order. A similar scenario played out in *Cromartie I*, in which the courts reviewed the General Assembly's creation of North Carolina's Twelfth Congressional District. 526 U.S. at 543, 119 S. Ct. at 1547, 143 L. Ed. 2d at 736. The plaintiffs filed suit in federal court, arguing that the district was the result of an unconstitutional racial gerrymander. *Id.* at 544-45, 119 S. Ct. at 1548, 143 L. Ed. 2d at 737. The three-judge panel of the United States District Court heard arguments pertaining to pending motions, but did not conduct an evidentiary hearing. *Id.* at 545, 119 S. Ct. at 1548, 143 L. Ed. 2d at 737. The panel majority, finding that the General Assembly used race-driven criteria in drawing the district and that doing so violated the Equal Protection Clause of the Fourteenth Amendment, granted the plaintiffs' motion for summary judgment and entered an injunction. *Id.* On appeal, the Supreme Court reversed, finding that the General Assembly's motivation in drawing district lines is a factual question that, when contested, should not be resolved by summary judgment. 526 U.S. at 549, 553, 119 S. Ct. at 1550, 1552, 143 L. Ed. 2d at 740, 742.

The posture of the litigants here is distinguishable because plaintiffs, unlike their counterparts in *Cromartie I*, lost at summary judgment and are the appealing party. However, even if we were to follow *Cromartie I*'s lead and reverse, plaintiffs could gain nothing on remand. The basis for our reversal would be that the trial court erred in applying strict scrutiny before making adequate findings of fact. As the trial court noted in its order, if defendants' plans survived strict scrutiny, they would surely survive a less rigorous review. On the other hand, if the trial court on remand found facts and determined once more that strict scrutiny is proper, the panel has already conducted its analysis under that standard. Although the dissent argues that the case should be remanded for additional findings, the record on which it would base those findings—which we have reviewed in detail—would not have changed. As a result, reversing and remanding to the trial court to make findings of fact and conclusions of law would achieve nothing but delay. *See e.g.*, *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 1430 n.6, 22 L. Ed. 2d 709, 715 n.6 (1969) (plurality) (stating that, when reviewing an agency decision that was based upon an incorrect standard, "it would be useless to remand" because "[t]here is not the slightest uncertainty" that the outcome would remain unchanged). Accordingly, as we review the voluminous record and the trial court's exhaustive analysis, we will proceed on the presumption that strict scrutiny is appropriate and apply that standard as we review the trial court's analysis. If these plans survive strict scrutiny, they survive rational basis review.

2.  Compelling Governmental Interest

We begin this analysis by considering the factors that defendants contend constitute a "compelling governmental interest."  *See Stephenson I*, 355 N.C. at 377, 562 S.E.2d at 393 (citation omitted).  Defendants argue that the General Assembly drafted the twenty-six districts both to avoid liability under section 2 of the VRA and to obtain preclearance under section 5 of the VRA by avoiding retrogression, which has been defined as "a change in voting procedures which would place the members of a racial or language minority group in a less favorable position than they had occupied before the change with respect to the opportunity to vote effectively."  *Id.* at 363-64, 562 S.E.2d at 385 (citations omitted).  Defendants' brief acknowledges that three principles guided the General Assembly:  (1) Compliance with the Whole County Provision of the Constitution of North Carolina, as set out in *Stephenson I* and *Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247 (2003) (hereinafter "*Stephenson II*"); (2) Where possible, establishment of VRA districts having a Total Black Voting Age Population above fifty percent, in accord with *Pender County v. Bartlett*, 361 N.C. 491, 649 S.E.2d 364 (2007) (hereinafter "*Pender County*"), *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009) (hereinafter "*Strickland*") (plurality); and (3) Exploration of "the possibility of establishing a sufficient number of VRA legislative districts to provide African American voters with rough proportionality in the number of VRA districts in which they have a reasonable opportunity to elect their candidates of choice."

Although the Supreme Court of the United States has never held outright that compliance with section 2 or section 5 can be a compelling state interest, the Court has issued opinions that expressly assumed as much. To be specific, the Supreme Court in *Shaw v. Hunt* assumed *arguendo* that compliance with section 2 could be a compelling state interest, 517 U.S. 899, 915, 116 S. Ct. 1894, 1905, 135 L. Ed. 2d 207, 225 (1996) (hereinafter "*Shaw II*"), and adopted a similar approach in *Miller*, where the issue was the State's desire to comply with section 5 of the Voting Rights Act, 515 U.S. at 921, 115 S. Ct. at 2490-91, 132 L. Ed. 2d at 783. In addition, the Supreme Court has observed that "deference is due to [States'] reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." *Vera*, 517 U.S. at 978, 116 S. Ct. at 1961, 135 L. Ed. 2d at 269 (plurality). The trial court here, footnoting several federal cases addressing the issue, stated that "[i]n general, compliance with the Voting Rights Act can be a compelling governmental interest." Faced squarely with the issue, we agree with the trial court. The Equal Protection Clause of the Fourteenth Amendment requires equal treatment regardless of race, while the Voting Rights Act requires consideration of race. Because the Constitution of the United States trumps any federal statute, a State's efforts to comply with the Voting Rights Act creates tension with the Fourteenth Amendment. Any violation of the latter triggers strict scrutiny, mandating that the State demonstrate a compelling interest. Because the Supreme Court of the United States and the United States Congress have indicated without ambiguity that they expect States to

comply with the Voting Rights Act, state laws passed for the purpose of complying with the Act must be capable of surviving strict scrutiny, indicating that such compliance is a compelling state interest.[3] This analysis applies equally to a State's efforts to comply with sections 2 and 5 of the Voting Rights Act.

Moreover, the General Assembly's desire to comply with the Voting Rights Act is justifiable for other reasons. Holding elections is a core State function, fundamental in a democracy. Establishing voting districts is an essential component of holding elections. In doing so, a State is subject to federal mandates in addition to those found in the Voting Rights Act and the Fourteenth Amendment, such as the "one-person, one-vote" requirement. *Stephenson I*, 355 N.C. at 363-64, 383, 562 S.E.2d at 384-85, 397. A determination that the State does not have a compelling interest in complying with federal mandates would invite litigation by those claiming that the State could never satisfy the requirements of strict scrutiny, undermining the General Assembly's efforts to create stable districts between censuses and citizen expectations that existing election districts are valid. On a level no less practical, we also assume that North Carolina, and all States for that matter, would prefer to avoid the expense and delay resulting from litigation.

---

[3] "If compliance with § 5 were not a compelling state interest, then a State could be placed in the impossible position of having to choose between compliance with § 5 and compliance with the Equal Protection Clause." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 518, 126 S. Ct. 2594, 2667, 165 L. Ed. 2d 609, 694 (2006) (hereinafter "*LULAC*") (Scalia, J., Thomas, J., Roberts, C.J. & Alito, J., dissenting in part).

Accordingly, we hold that compliance with sections 2 and 5 of the Voting Rights Act may be a compelling state interest.

We next consider whether compliance with either section 2 or section 5 constitutes a compelling state interest under the facts presented here. Those goals may reach the level of a compelling state interest if two conditions are satisfied. First, the General Assembly must have identified past or present discrimination with some specificity before it could turn to race-conscious relief. *Shaw II*, 517 U.S. at 909, 116 S. Ct. at 1902, 135 L. Ed. 2d at 221 (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504, 109 S. Ct. 706, 727, 102 L. Ed. 2d 854, 889 (1989)). Second, before acting, the General Assembly must also have "had 'a strong basis in evidence' " on which to premise a conclusion that the race-based remedial action was necessary. *Id.* at 910, 116 S. Ct. at 1903, 135 L. Ed. 2d at 222 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S. Ct. 1842, 1849, 90 L. Ed. 2d 260, 271 (1986) (plurality)).

a. Compelling Interest Under Section 2 of the Voting Rights Act

Before we turn our attention to consideration of individual districts, we consider the application of section 2 of the VRA in the instant case. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S. Ct. 2752, 2764, 92 L. Ed. 2d 25, 44 (1986); *see* 52

U.S.C.S. §§ 10301-10702 (LexisNexis 2014).  The question of voting discrimination *vel non*, including vote dilution, is determined by the totality of the circumstances. *Gingles*, 478 U.S. at 43-46, 106 S. Ct. at 2762-64, 92 L. Ed. 2d at 42-44 (discussing section 2(b) of the VRA, now codified at 52 U.S.C.S. § 10301(b)).  However, under *Gingles*, a reviewing court does not reach the totality of circumstances test unless the challenging party is able to establish three preconditions, *id.* at 50-51, 106 S. Ct. at 2766-67, 92 L. Ed. 2d at 46-47.  First, a "minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Id.* at 50, 106 S. Ct. at 2766, 92 L. Ed. 2d at 46.  Second, the minority group must "show that it is politically cohesive."  *Id.* at 51, 106 S. Ct. at 2766, 92 L. Ed. 2d at 47.  Finally, the minority group must "be able to demonstrate that the majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Id.* at 51, 106 S. Ct. at 2766-67, 92 L. Ed. 2d at 47.  Although *Gingles* dealt with multi-member districts, the same preconditions must be met when a claim of vote dilution is made regarding a single-member district.  *Growe v. Emison*, 507 U.S. 25, 40-41, 113 S. Ct. 1075, 1084, 122 L. Ed. 2d 388, 403-04 (1993); *see also Johnson v. De Grandy*, 512 U.S. 997, 1006-07, 114 S. Ct. 2647, 2654-55, 129 L. Ed. 2d 775, 788 (1994).

Unlike cases such as *Gingles*, in which minority groups use section 2 as a sword to challenge districting legislation, here we are considering the General Assembly's use of section 2 as a shield.  Defendants argue that, because the *Gingles*

test considers race, the State has a compelling interest in preemptively factoring race into its redistricting process to ensure that its plans would survive a legal challenge brought under section 2. To establish that this state interest is legitimate, defendants must show a strong basis in evidence that the possibility of a section 2 violation existed at the time of the redistricting. *See Shaw II*, 517 U.S. at 910, 916, 116 S. Ct. at 1903, 1905-06, 135 L. Ed. 2d at 222, 225-26. However, because this inquiry addresses only the possibility of a section 2 violation, and because a totality of the circumstances inquiry is by its nature fact-specific, defendants' evidence need only address "the three *Gingles* preconditions" to establish a compelling governmental interest. *See Vera*, 517 U.S. at 978, 116 S. Ct. at 1961, 135 L. Ed. 2d at 269 (citing *Growe*, 507 U.S. at 40, 113 S. Ct. at 1084, 122 L. Ed. 2d at 403-04).

Thus, to establish a compelling interest in complying with section 2 when the redistricting plans were developed, the legislature at that time must have had a strong basis in evidence that the Total Black Voting Age Population in a geographically compact area was fifty percent plus one of the area's voting population. Such evidence would satisfy the first *Gingles* precondition. *Pender Cnty.*, 361 N.C. at 503, 649 S.E.2d at 372. In addition, a strong basis in evidence of racially polarized voting in that same geographical area would satisfy the second and third preconditions set out in *Gingles*. *LULAC*, 548 U.S. at 427, 126 S. Ct. at 2615, 165 L. Ed. 2d at 637 (majority). Against this background, we consider the

trial court's application of these standards in discerning whether defendants here could legitimately claim a compelling interest in complying with section 2.

The trial court's order included several extensive appendices. In the body of the order, the trial court described the legislative record that existed when the plans were enacted, then referred to Appendix A, where this information was presented in detail. Appendix A, titled "Findings of Fact Relevant to the Issue of Racial Polarization in Specific Locations where Voting Rights Act Districts were Placed in the Enacted Plans," is incorporated by reference into the trial court's order.

Appendix A is broken into three parts. Part I, titled "General Findings of Fact," opens with a summary of the background of the case, then notes results of recent elections. For instance, the trial court observed that all African-American incumbents elected to the North Carolina General Assembly or the United States Congress in 2010 were elected in districts that were either majority African-American or majority-minority coalition districts. In addition, no African-American candidate elected in 2010 was elected from a majority white crossover district, and two African-American incumbent state senators running in majority white districts were defeated in that election. No African-American candidate for the United States Congress was elected in a majority white district between 1992 and 2010, while from 2004 through 2010, no African-American candidate was elected to office in a statewide partisan election.

In this Part I of Appendix A, the court also considered an academic study of racially polarized voting conducted by Ray Block, Jr., Ph.D. This study, prepared for the Southern Coalition of Social Justice, is titled "Racially Polarized Voting in 2006, 2008, and 2010 in North Carolina State Legislative Contests." Dr. Block employed Justice Brennan's conclusion in *Gingles* that racially polarized voting occurs when there is a consistent relationship between the race of the voter and the way in which that person votes, and found that such a relationship existed in the areas examined. He added that he also found evidence that "majority-minority districts facilitate the election of African American candidates." The court determined that Dr. Block's study provided "substantial evidence regarding the presence of racially polarized voting in almost all of the counties[4] in which the General Assembly enacted the 2011 VRA districts."

Nevertheless, the trial court observed that the North Carolina General Assembly identified a few limitations in Dr. Block's study. For instance, the study did not pinpoint the percentage of white voters in majority African-American or majority-minority districts who voted for the candidate of choice of African-American voters. In addition, his study could analyze a legislative election only when the African-American candidate had opposition. As a result, the General Assembly commissioned Thomas L. Brunell, Ph.D. to prepare a supplementary

---

[4] These counties were Beaufort, Bertie, Chowan, Craven, Cumberland, Durham, Edgecombe, Gates, Guilford, Granville, Greene, Halifax, Hertford, Hoke, Jones, Lenoir, Martin, Mecklenburg, Nash, Northampton, Pasquotank, Perquimans, Pitt, Robeson, Sampson, Scotland, Vance, Wake, Warren, Washington, Wayne, and Wilson.

report. Dr. Brunell's study, titled "Report on Racially Polarized Voting in North Carolina," examined the forty North Carolina counties covered by section 5 of the Voting Rights Act, plus Columbus, Duplin, Durham, Forsyth, Jones, Mecklenburg, Richmond, Sampson, Tyrrell, Wake, and Warren Counties. Dr. Brunell found "statistically significant racially polarized voting" in fifty of these fifty-one counties.

The trial court made additional findings of fact in Part I of Appendix A that we believe would be pertinent to a *Gingles* totality of circumstances test and that, by extension, indicate a strong basis in evidence that the *Gingles* preconditions existed. At the beginning of the redistricting process, the General Assembly noted that North Carolina had been ordered to create majority African-American districts as a remedy for section 2 violations in Bertie, Chowan, Edgecombe, Forsyth, Gates, Halifax, Martin, Mecklenburg, Nash, Northampton, Wake, Washington, and Wilson Counties. *See Gingles v. Edmisten*, 590 F. Supp. 345, 365-66, 376 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom., Thornburg v. Gingles*, 478 U.S. at 80, 106 S. Ct. at 2782, 92 L. Ed. 2d at 65. Faculty at the North Carolina School of Government advised the chairs of the General Assembly's redistricting committees that North Carolina is still bound by the holding in *Gingles*. In addition, the United States District Court noted on remand from the decision in *Cromartie I* that the parties there had stipulated that legally significant racially polarized voting was present in North Carolina's First Congressional District. *Cromartie v. Hunt*, 133 F. Supp. 2d 407, 422-23 (E.D.N.C. 2000), *rev'd, Cromartie II*, 532 U.S. 234, 121 S. Ct. 1452, 149

L. Ed. 2d 430. The trial court found that consideration of race in the construction of the First District was reasonably necessary to protect the State from liability under the Voting Rights Act. *Id.* at 423. This finding by the trial court was not appealed and thus is not affected by the holding in *Cromartie II* and remains good law.

In addition, the trial court found as fact that the documents submitted by plaintiffs included a law review article prepared by an attorney for the North Carolina NAACP. Anita S. Earls et al., *Voting Rights in North Carolina 1982-2006*, 17 S. Cal. Rev. L. & Soc. Just. 577 (2008). The court observed that this article "also provided evidence of racially polarized voting as alleged or established in voting rights lawsuits filed in many of the counties[5] in which 2011 VRA districts were enacted." The court added as a finding of fact that no witness testified that racial polarization had disappeared either statewide or in those areas in which the General Assembly previously had created VRA districts.

In Part II of Appendix A, the trial court conducted an individualized analysis of each of the VRA districts created by the General Assembly in 2011. Generally, each finding of fact relates to one district. While four of the findings of fact deal with more than one district, in each such instance those districts are situated within the same county. Each finding of fact in this Part II follows a similar pattern. The finding of fact begins with data that explain how the information in

---

[5] The article included references to cases involving the following counties: Beaufort, Bladen, Cumberland, Duplin, Forsyth, Franklin, Granville, Halifax, Lenoir, Montgomery, Pasquotank, Person, Pitt, Richmond, Sampson, Scotland, Tyrrell, Vance, Wayne, and Washington.

Part I of the Appendix applies to the district under examination. The finding of fact lists the counties included in the district, along with that district's Total Black Voting Age Population. This information is pertinent to the first *Gingles* precondition, that the minority group is able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. *See Pender Cnty.*, 361 N.C. at 503, 649 S.E.2d at 372 (discussing *Gingles*, 478 U.S. at 50, 106 S. Ct. at 2766, 92 L. Ed. 2d at 46). Subsequent sections of each finding of fact set out how racially polarized voting was found in many of the counties contained within the district or districts, under either Dr. Block's analysis or Dr. Brunell's analysis, or both. This information is pertinent to both the second and third *Gingles* preconditions: that the minority group is politically cohesive and that the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *LULAC*, 548 U.S. at 427, 126 S. Ct. at 2615, 165 L. Ed. 2d at 637. Additional information in the finding of fact conveys how many counties within the district or districts are affected by *Gingles* or *Cromartie II*, or both. This information is useful in determining the totality of circumstances.

Plaintiffs have not challenged any of the trial court's findings of fact relating to the twenty-six VRA districts, and thus those findings are binding on appeal. *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. The trial court's findings of fact indicate that each of the challenged districts had a Total Black Voting Age Population exceeding fifty percent, thus satisfying the first *Gingles* precondition.

*See Pender Cnty.*, 361 N.C. at 503, 649 S.E.2d at 372. The facts found by the trial court also indicate that the maps are sufficient to satisfy the second and third *Gingles* preconditions, as each district demonstrates racially polarized voting according to Dr. Brunell's analysis. *See LULAC*, 548 U.S. at 427, 126 S. Ct. at 2615, 165 L. Ed. 2d at 637. Although Dr. Block's analysis did not cover some of the counties in some of the challenged districts, where the two studies overlapped, they reached the same conclusions.

Moreover, the trial court made additional findings of fact, recited above, that would be relevant to the *Gingles* totality of circumstances test for twenty-two of the challenged VRA districts.[6] Specifically, of the twenty-six VRA districts challenged here, fifteen include counties lying within the area where the *Gingles* court found section 2 violations; nine include counties lying within the area which the parties in the *Cromartie* litigation stipulated to have racially polarized voting; and thirteen included counties that were subject to various section 2 lawsuits filed between 1982 and 2006 in which plaintiffs alleged or established racially polarized voting.[7] While we assume from the Supreme Court's language in *Vera*, 517 U.S. at 978, 116 S. Ct. at 1960-61, 135 L. Ed. 2d at 269, that satisfaction of the *Gingles* preconditions is sufficient to trigger a State's compelling interest in avoiding section 2 liability, we

---

[6] The districts not affected by this evidence are Senate 28, House 29, House 31, and House 57.

[7] The only districts not affected by at least one of these three pieces of evidence are Senate 28, House 29, House 31, and House 57.

believe that this additional evidence, while pertaining to only some of the covered districts, is consistent with and reinforces the trial court's conclusions of law.

Based upon the totality of this evidence, we are satisfied that the trial court correctly found that the General Assembly identified past or present discrimination with sufficient specificity to justify the creation of VRA districts in order to avoid section 2 liability. *See Shaw II*, 517 U.S. at 909, 116 S. Ct. at 1902, 135 L. Ed. 2d at 221. In addition, we see that the General Assembly, before making its redistricting decisions, had a strong basis in evidence on which to reach a conclusion that race-based remedial action was necessary for each VRA district. *Id.* at 910, 116 S. Ct. at 1903, 135 L. Ed. 2d at 222. Accordingly, we conclude that the trial court's findings of fact as to these VRA districts support its conclusion of law that defendants established a compelling state interest in creating districts that would avoid liability under section 2 of the Voting Rights Act.

b. Compelling Governmental Interest under Section 5 of the Voting Rights Act

As noted above, forty of North Carolina's one hundred counties were covered by section 5 at the time of redistricting. This section, which prevents retrogression, forbids "[a]ny voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or

color . . . to elect their preferred candidates of choice." 52 U.S.C.S. § 10304(b).[8] Section 5 requires preclearance, either by the United States Department of Justice or by a three-judge panel of the United States District Court for the District of Columbia, of any election procedure that is different from that in force on the relevant coverage date. *See Perry v. Perez*, ___ U.S. ___, ___, 132 S. Ct. 934, 939, 181 L. Ed. 2d 900, 904 (2012) (per curiam) (citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S 193, 198, 129 S. Ct. 2504, 2509, 174 L. Ed. 2d 140, 147 (2009)). The Supreme Court has left no doubt, however, that in fashioning its redistricting plans, a State must comply with the substantive requirements of section 5, not merely obtaining preclearance from the Department of Justice. *Miller*, 515 U.S. at 922, 115 S. Ct. at 2491, 132 L. Ed. 2d at 783. As the Supreme Court intimated in *Miller*, the Department of Justice is not infallible, so courts have "an independent obligation in adjudicating consequent equal protection challenges to ensure that the State's actions are narrowly tailored to achieve a compelling interest." *Id.* Section 5 does not "give covered jurisdictions *carte blanche* to engage in racial gerrymandering in the name of nonretrogression. A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression." *Shaw I*, 509 U.S. at 655, 113 S. Ct. at 2831, 125 L. Ed. 2d at 534.

---

[8] This statute no longer applies in North Carolina. *Shelby Cnty. v. Holder*, ___ U.S. ___, 133 S. Ct. 2612, 186 L. Ed. 2d 651 (2013).

We concluded above that compliance with section 5 is a compelling state interest. Turning then to the facts of this case, we take into account the evidence recited above in our discussion regarding the State's concern about possible section 2 liability. In addition, the appendices to the trial court's order indicate that all of North Carolina Senate Districts 5, 21, and 28, and all of North Carolina House Districts 5, 7, 12, 24, 42, and 57, are in counties covered by section 5. Also, section 5 covers most of the territory contained in United States Congressional District One, Senate Districts 4 and 20, and House Districts 21, 32, and 48. Moreover, all of the twenty-six challenged districts contain areas that previously have been part of majority-minority districts. As a result of their connection with counties covered under section 5, these districts may become subject to nonretrogression analysis. *Georgia v. Ashcroft*, 539 U.S. 461, 479, 123 S. Ct. 2498, 2511, 156 L. Ed. 2d 428, 451 (2003) ("[I]n examining whether the new plan is retrogressive, the inquiry must encompass the entire statewide plan as a whole. Thus, while the diminution of a minority group's effective exercise of the electoral franchise in one or two districts may be sufficient to show a violation of § 5, it is only sufficient if the covered jurisdiction cannot show that the gains in the plan as a whole offset the loss in a particular district." (internal citations omitted)). Accordingly, we conclude from the totality of the evidence that a history of discrimination justified the General Assembly's concern about retrogression and compliance with section 5. We further

conclude that the General Assembly had a strong basis in evidence on which to reach a conclusion that race-based remedial action was necessary.

3. Narrow Tailoring

Having determined that defendants had a compelling interest both in avoiding section 2 liability and in avoiding retrogression under section 5, we now consider whether the redistricting was sufficiently narrowly tailored to advance those state interests as to the twenty-six districts created to comply with the Voting Rights Act. *See Stephenson I*, 355 N.C. at 377, 562 S.E.2d at 393. In the context of redistricting,

> the "narrow tailoring" requirement of strict scrutiny allows the States a limited degree of leeway in furthering such interests [as VRA compliance]. If the State has a "strong basis in evidence" for concluding that creation of a majority-minority district is reasonably necessary to comply with § 2, and the districting that is based on race "substantially addresses the § 2 violation," it satisfies strict scrutiny.

*Vera*, 517 U.S. at 977, 116 S. Ct. at 1960, 135 L. Ed. 2d at 268 (internal citations omitted). Thus, while a State does not have a free hand when crafting districts with the intent of avoiding section 2 liability, the Supreme Court has acknowledged that "[a] § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless 'beauty contests.' " *Id.* at 977, 116 S. Ct. at 1960, 135 L. Ed. 2d at 269.

As discussed above, the trial court found that the General Assembly designed each of the challenged districts to consist of a Total Black Voting Age Population exceeding fifty percent of the total voting age population in that district. We have held that doing so is permissible as a method of addressing potential liability under section 2. *Pender Cnty.*, 361 N.C. at 503, 649 S.E.2d at 372. Unlike redistricting plans that have been faulted for setting arbitrary thresholds for Total Black Voting Age Population*, see, e.g., Page*, 2014 WL 5019686, at \*6 (citing and quoting *Smith v. Beasley*, 946 F. Supp. 1174, 1207 (D.S.C.) (1996)), the target of fifty percent plus one of the Total Black Voting Age Population chosen by North Carolina's General Assembly is consistent with the requirements of the first *Gingles* precondition. Nevertheless, because section 2 limits the use of race in creating remedial districts by allowing race to be considered only to the extent "reasonably necessary" for compliance, the question arises whether the percentages of Total Black Voting Age Population in each of North Carolina's challenged districts are higher than "reasonably necessary" to avoid the risk of vote dilution. *See Vera*, 517 U.S. at 979, 116 S. Ct. at 1961, 135 L. Ed. 2d at 269.

The Total Black Voting Age Population percentage ranges from a low of 50.45% to a high of 57.33% in the twenty-six districts in question. However, the *average* Total Black Voting Age Population of the challenged districts is only 52.28%. Twenty-one of the twenty-six districts have Total Black Voting Age populations of less than 53%, and only two of these districts, Senate 28 and House

24, exceed 55% Total Black Voting Age Population. We are mindful that a host of other factors were considered in addition to race, such as the Whole County Provision of the Constitution of North Carolina, protection of incumbents, one-person, one-vote requirements and partisan considerations. As a result, we are satisfied that these districts are sufficiently narrowly tailored. They do not classify individuals based upon race to an extent greater than reasonably necessary to comply with the VRA, while simultaneously taking into account traditional districting principles.

Plaintiffs argue that creating districts with a Total Black Voting Age Population percentage exceeding fifty percent constitutes impermissible racial packing, citing *Vera*, 517 U.S. at 983, 116 S. Ct. at 1963, 135 L. Ed. 2d at 272; *Missouri v. Jenkins*, 515 U.S. 70, 88, 115 S. Ct. 2038, 2049, 132 L. Ed. 2d 63, 80 (1995); and *Shaw I*, 509 U.S. at 655, 113 S. Ct. at 2831, 125 L. Ed. 2d at 534. Plaintiffs also argue that districts with a Total Black Voting Age Population exceeding fifty percent are not automatically necessary because minority voters in crossover and coalition districts have elected candidates of their choice where the Total Black Voting Age Population was between forty and fifty percent. However, this Court previously has considered, but declined to adopt, similar arguments. *Pender Cnty.*, 361 N.C. at 502-04, 649 S.E.2d at 371-73. We concluded in that case that applying a bright line rule—that the presence of more than fifty percent of the Total Black Voting Age Population satisfied the first *Gingles* prong—was logical

and gave the General Assembly "a safe harbor for the redistricting process." *Id.* at 505, 649 S.E.2d at 373.

Although the burden is upon the State under strict scrutiny, the parties challenging the redistricting must also make a showing.

> In a case such as this one where majority-minority districts (or the approximate equivalent) are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance.

*Cromartie II*, 532 U.S. at 258, 121 S. Ct. at 1466, 149 L. Ed. 2d at 453. Here, when the evidence is undisputed that racial identification correlates highly with party affiliation, plaintiffs have failed to meet this obligation. The General Assembly's plans fall within the safe harbor provisions of *Pender County* while respecting, to the extent possible, the Whole County Provision, as mandated by *Stephenson I*. In contrast, plaintiffs' proposals would effectively invite the type of litigation over section 2 claims envisioned in *Pender County*, *see* 361 N.C. at 505-06, 649 S.E.2d at 373, while failing to provide for the legitimate political goals pursued by the General Assembly in its plans.

We are aware of the Supreme Court's warning that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth

and Fifteenth Amendments." *Strickland*, 556 U.S. at 24, 129 S. Ct. at 1249, 173 L. Ed. 2d at 190 (plurality) (citations omitted). In addressing this possibility, we note that the average Total Black Voting Age Population in the twenty-six VRA districts is 52.28% of the total voting age population. This figure indicates that minority voters were moved out of crossover districts only to the extent necessary to meet *Pender County*'s safe harbor provision, while simultaneously pursuing other legitimate political goals, including those mentioned above. Where racial identification correlates highly with party affiliation, placing additional Democratic voters in districts that already vote Democratic is not forbidden as long as the motivation for doing so is not primarily racial. *See Cromartie I*, 526 U.S. at 551-52, 119 S. Ct. at 1551, 143 L. Ed. 2d at 741. Accordingly, we conclude that plaintiffs have failed to demonstrate improper packing or gerrymandering based upon race.

4. Proportionality

Finally, because plaintiffs challenge the General Assembly's consideration of proportionality, the trial court analyzed whether the legislature used proportionality in the enacted plans improperly to "link[ ] the number of majority-minority voting districts to minority members' share of the relevant population." *See De Grandy*, 512 U.S. at 1014, 114 S. Ct. at 2658 n.11, 129 L. Ed. 2d at 792 n.11. The trial court found as fact that "the General Assembly acknowledges that it intended to create as many VRA districts as needed to achieve a 'roughly proportionate' number of Senate, House and Congressional districts as compared to

the Black population in North Carolina," adding that each VRA district had to be at least fifty percent African-American in voting age population. The trial court specifically found that the General Assembly's enacted plans

> endeavored to create VRA districts in roughly the same proportion as the ratio of Black population to total population in North Carolina. In other words, because the 2010 census figures established that 21% of North Carolina's population over 18 years of age was 'any part Black,' the corresponding rough proportion of Senate seats, out of 50 seats, would be 10 seats, and hence 10 VRA Senate districts. Likewise, of the 120 House seats, 21% of those seats would be roughly 25 House seats, and hence 25 VRA districts.

Based on these and other findings, the trial court concluded that "the General Assembly had a strong basis in evidence for concluding that 'rough proportionality' was reasonably necessary to protect the State from anticipated liability under § 2 of the VRA and ensuring preclearance under § 5 of the VRA."

Plaintiffs now argue that this conclusion is erroneous as a matter of law because racial proportionality is neither a compelling governmental interest nor a requirement of the VRA. They contend that, because "[t]he VRA was not designed to guarantee majority-minority voting districts, but to guarantee that the processes, procedures, and protocols would be fair and free of racial discrimination," the legislature's redistricting was based upon an unconstitutional premise. Plaintiffs contend that, by focusing on proportionality at the statewide level, the General Assembly necessarily predetermined how many VRA districts to draw without first considering where potential liability existed for section 2 violations. Plaintiffs

maintain that, as a result, the General Assembly's process sought " 'outright racial balancing,' " which is "patently unconstitutional" under such cases as *Fisher v. University of Texas at Austin*, ___ U.S. ___, ___, 133 S. Ct. 2411, 2419, 186 L. Ed. 2d 474, 486 (2013), *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 729-30, 127 S. Ct. 2738, 2757, 168 L. Ed. 2d 508, 529 (2007) (plurality), and *Grutter v. Bollinger*, 539 U.S. 306, 330, 123 S. Ct. 2325, 2339, 156 L. Ed. 2d 304, 333 (2003), and thus can neither be required by section 2 nor constitute a compelling state interest.

The VRA provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C.S. § 10301(b). Consistent with this proviso, the Supreme Court has repeatedly held that proportionality does not provide a safe harbor for States seeking to comply with section 2. *LULAC*, 548 U.S. at 436, 126 S. Ct. at 2620, 165 L. Ed. 2d at 642 (citing *De Grandy*, 512 U.S. at 1017-21, 114 S. Ct. at 2660-62, 129 L. Ed. 2d at 794-97). Such a rule "would be in derogation of the statutory text and its considered purpose . . . and of the ideal that the Voting Rights Act of 1965 attempts to foster," *De Grandy*, 512 U.S. at 1018, 114 S. Ct. at 2660, 129 L. Ed. 2d at 795, and could allow "the most blatant racial gerrymandering . . . so long as proportionality was the bottom line," *id.* at 1019, 114 S. Ct. at 2661, 129 L. Ed. 2d at 796. Even so, the Court has also held that proportionality can be an element of the "totality of circumstances" test under *Gingles*. *Id.* at 1000, 114 S. Ct.

at 2651, 129 L. Ed. 2d at 784. When considered in this manner, the Court has instructed that the "probative value assigned to proportionality may vary with other facts" and "[n]o single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength." *Id.* at 1020-21, 114 S. Ct. at 2661-62, 129 L. Ed. 2d at 797; *see also LULAC*, 548 U.S. at 436, 126 S. Ct. at 2620, 165 L. Ed. 2d at 642.

In light of these standards, the record here demonstrates that the General Assembly did not use proportionality improperly to guarantee the number of majority-minority voting districts based on the minority members' share of the relevant population. We believe that such an effort, seeking to guarantee proportional representation, proportional success, or racial balancing, would run afoul of the Equal Protection Clause. *See De Grandy*, 512 U.S. at 1017-22, 114 S. Ct. at 2658-62, 129 L. Ed. 2d at 794-98. Instead, the General Assembly considered rough proportionality in a manner similar to its prophylactic consideration of the *Gingles* preconditions, as a means of inoculating the redistricting plans against potential legal challenges under section 2's totality of the circumstances test. Proportionality was not a dispositive factor, but merely one consideration of many described in the materials and other contributions from numerous organizations, experts, and lay witnesses. The General Assembly's consideration of rough proportionality was merely a means of avoiding voter dilution and potential section 2 liability, not an attempt to trade "the rights of some minority voters under § 2 . . .

off against the rights of other members of the same minority class." *Id.* at 1019, 114 S. Ct. at 2661, 129 L. Ed. 2d at 796. Accordingly, we conclude that this factor does not constitute grounds for a violation of section 2.

Thus, with regard to the VRA districts, we hold that, while the General Assembly considered race, the trial court erred by concluding prematurely that race was the predominant factor motivating the drawing of the districts without first performing adequate fact finding. However, because we held above that the trial court correctly found that each of the twenty-six districts survives strict scrutiny, we need not remand the case for reconsideration under what may be a less demanding standard of review.

C. Non-VRA districts

We now turn to the four districts that the trial court found were not drawn as VRA districts but which were challenged by plaintiffs as being the result of racial gerrymandering. These were the Fourth and Twelfth Congressional Districts, North Carolina Senate District 32, and North Carolina House District 54.

The trial court made numerous specific findings of fact as to whether race was the General Assembly's predominant motive in drafting these districts. For example, the court found that race was not a factor in drawing Congressional District Twelve, Congressional District Four, and House District 54. In fact, the record indicates that the drafters of these three districts did not consider racial data. The trial court found that political goals were a factor in drawing

Congressional Districts Twelve and Four, and that protection of incumbents was a factor in drawing Congressional District Twelve and House District 54. The trial court found that the drafting of Senate District 32 was compelled by the need to comply with the population distribution requirements set out in *Stephenson I*. In addition, the drafters were instructed to comply with *Cromartie II* in drawing Congressional District Twelve and Congressional District Four, and with *Gingles* in Senate District 32. The drafters considered the Whole County Provision of the North Carolina Constitution in drawing Senate District 32 and House District 54. Based on these findings, the trial court determined that the "shape, location and composition" of each of these districts was dictated not only by such factors as a desire to avoid liability under section 2 of the Voting Rights Act and attaining preclearance under section 5 of that Act, but also by other "equally dominant legislative motivations," such as complying with the North Carolina Constitution, equalizing population among districts, protecting incumbents in both parties, and fashioning districts "that were more competitive for Republican candidates than the plans used in past decades or any of the alternative plans."

Once the trial court found that race was not a predominant motive in drafting these four districts, it applied the rational basis test. Under this test, a court considers whether the drawing of the districts bears " '*some* rational relationship to a conceivable legitimate governmental interest.' " *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 180, 594 S.E.2d 1, 15 (2004) (quoting *Texfi Indus., Inc. v. City*

*of Fayetteville*, 301 N.C. 1, 11, 269 S.E.2d 142, 149 (1980) (emphasis added)). Concluding that "the General Assembly has articulated a reasonably conceivable state of facts, other than a racial motivation, that provides a rational basis for creating the non-VRA districts," the trial court found that plaintiffs' challenge to these districts failed.

Plaintiffs argue to us that the trial court erred in its findings of fact and conclusions of law regarding Congressional District Twelve and North Carolina Senate District 32, contending that race manifestly was the predominant factor in the construction of these districts. As detailed above, the trial court found both racial and non-racial motivations, with neither category predominant. When a trial court sits without a jury, "the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even though the evidence could be viewed as supporting a different finding." *Bailey v. State*, 348 N.C. 130, 146, 500 S.E.2d 54, 63 (1998) (citation omitted). Although plaintiffs argue that the evidence cited by the trial court was pretextual and implausible and contend that we should consider and be persuaded by other evidence more favorable to their position that was also presented to the trial court, plaintiffs do not contend that the evidence credited and cited by the trial court was not competent.

We conclude that the trial court did not err either in its determination that the rational basis test was appropriate or in its application of that test to the

evidence it credited. The Supreme Court of the United States has recognized that compliance with federal law, incumbency protection, and partisan advantage are all legitimate governmental interests. *See Shaw I*, 509 U.S. at 654, 113 S. Ct. at 2830, 125 L. Ed. 2d at 533 (compliance with federal law); *Karcher*, 462 U.S. at 740, 103 S. Ct. at 2663, 77 L. Ed. 2d at 147 (incumbency protection); *Cromartie I*, 526 U.S. at 551, 119 S. Ct. at 1551, 143 L. Ed. 2d at 741 (partisan interests). In light of this authority and the trial court's findings of fact, we agree that plaintiffs failed to establish that race was the dominant factor in drafting these districts and conclude that the trial court's application of the rational basis test was appropriate. The court's findings of fact support its conclusions of law. The General Assembly's actions in creating these districts were rationally related to all its expressed goals. Accordingly, we affirm the trial court as to these non-VRA districts.

III. Plaintiffs' State Claims

We now consider plaintiffs' claims brought under state law. Plaintiffs argue that the trial court erred when it failed to find that the enacted Senate and House plans violate the Whole County Provision of the North Carolina Constitution. Article II, Section 3(3) of the Constitution of North Carolina provides that "[n]o county shall be divided in the formation of a senate district," while Article II, Section 5(3) contains a similar provision with regard to each representative district. These prohibitions against dividing counties in the creation of General Assembly districts collectively are called the Whole County Provision.

The tension between the Whole County Provision and federal requirements is apparent. In 1983, a three-judge panel of the United States District Court for the Eastern District of North Carolina held that the Whole County Provision was unenforceable anywhere in the State. *Cavanagh v. Brock*, 577 F. Supp. 176, 181-82 (E.D.N.C. 1983). However, this Court subsequently rejected *Cavanagh*'s analysis and held that the Whole County Provision remained enforceable to the extent that it could be harmonized with federal law. *Stephenson I*, 355 N.C. at 374, 562 S.E.2d at 391. As a result, the Whole County Provision remains in effect but must accommodate both the one-person, one-vote mandate and the requirements of the VRA. Since the Constitution of North Carolina provides that each senator and each representative shall represent "as nearly as may be" an equal number of inhabitants, N.C. Const. art. II, §§ 3(1), 5(1), the former federal requirement is met by definition. Thus, we consider plaintiffs' contentions that the challenged House and Senate districts violate the Whole County Provision, as harmonized with the VRA.

This Court has set out nine criteria for ensuring that House and Senate districts satisfy both the Whole County Provision and the Voting Rights Act. *Stephenson I*, 355 N.C. at 383-84, 562 S.E.2d at 396-97. These criteria may be summarized as follows: First, "legislative districts required by the VRA shall be formed" before non-VRA districts. *Id.* at 383, 562 S.E.2d at 396-97. Second, "[i]n forming new legislative districts, any deviation from the ideal population for a

legislative district shall be at or within plus or minus five percent" to ensure "compliance with federal 'one-person, one-vote' requirements." *Id.* at 383, 562 S.E.2d at 397. Third, "in counties having a . . . population sufficient to support the formation of one non-VRA legislative district," "the physical boundaries" of the non-VRA district shall "not cross or traverse the exterior geographic line of" the county. *Id.* Fourth, "[w]hen two or more non-VRA legislative districts may be created within a single county," "single-member non-VRA districts shall be formed within" the county, "shall be compact," and "shall not traverse" the county's exterior geographic line. *Id.* Fifth, for non-VRA counties that "cannot support at least one legislative district," or counties "having a non-VRA population pool" that, "if divided into" legislative "districts, would not comply with" one-person, one-vote requirements, the General Assembly should combine or group "the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the [one-person, one-vote] standard, whose boundary lines do not cross or traverse the 'exterior' line of the multi-county grouping." 355 N.C. at 383-84, 562 S.E.2d at 397. "[T]he resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard." *Id.* at 384, 562 S.E.2d at 397. Sixth, "only the

smallest number of counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard shall be combined." *Id.* Seventh, "communities of interest should be considered in the formation of compact and contiguous [legislative] districts." *Id.* Eighth, "multi-member districts shall not be" created "unless it is established that such districts are necessary to advance a compelling governmental interest." *Id.* Ninth, "any new redistricting plans . . . shall depart from strict compliance with" these criteria "only to the extent necessary to comply with federal law." *Id.*

In their discussion of the Whole County Provision, plaintiffs contend that the test of a plan's compliance with *Stephenson I*'s fifth and sixth criteria is the number of counties left undivided. They argue that the current plan violates *Stephenson I* because it divides counties and traverses county lines to an unnecessary extent. In support of their argument, plaintiffs submit charts indicating that their suggested "House Fair and Legal" plan results in five fewer divided counties and six fewer county line traversals than the enacted House plan, while maintaining the same number of groupings. Similarly, plaintiffs' charts indicate that their suggested "Senate Fair and Legal" plan divides five fewer counties and contains eleven fewer traversals of county lines than the enacted Senate plan.

Defendants respond that plaintiffs have misinterpreted the requirements of *Stephenson I*. According to defendants, *Stephenson I* is satisfied by minimizing the number of counties contained within each multi-county grouping. In other words, a

proper plan maximizes the number of possible two-county groupings before going on to create three-county groupings, maximizes the number of possible three-county groupings before creating four-county groupings, and so on. Defendants argue that plaintiffs have misread *Stephenson I* because, under *Stephenson I,* divisions of counties and traversals of county lines are relevant only if plaintiffs' alternative maps are comparable to the State's maps in terms of the number of counties within each grouping. In support of its argument, the State provides charts showing that the enacted House and Senate plans result in a greater number of groupings that contain fewer counties, as compared with the various proposed alternative plans, all of which create groupings that contain more counties than the enacted plans. To illustrate, the enacted House district plan contains eleven groupings consisting of one county and fifteen groupings consisting of two counties. The closest comparable alternative plan proposed by plaintiffs, House Fair and Legal, also contains eleven groupings consisting of one county but only nine groupings consisting of two counties. Similarly, while both the enacted Senate plan and plaintiffs' proposed Senate Fair and Legal contain one grouping consisting of one county and eleven groupings consisting of two counties, the enacted plan contains four districts consisting of three counties while Senate Fair and Legal contains only three groupings consisting of three counties.

While we are conscious of the efforts of the litigants to interpret *Stevenson I*'s requirements faithfully, after careful review of our opinions in *Stephenson I* and

*Pender County*, we are satisfied that defendants' interpretation is correct. *Stephenson I*'s fifth factor states that, when combining two or more counties to comply with the one-person, one-vote standard, "the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary" for compliance. 355 N.C. at 384, 562 S.E.2d at 397. Only after these groupings have been established does *Stephenson I* state that "the resulting interior county lines . . . may be crossed or traversed . . . only to the extent necessary to comply with the . . . 'one-person, one-vote' standard." *Id.* Thus, the process established by this Court in *Stephenson I* and its progeny requires that, in establishing legislative districts, the General Assembly first must create all necessary VRA districts, single-county districts, and single counties containing multiple districts. Thereafter, the General Assembly should make every effort to ensure that the maximum number of groupings containing two whole, contiguous counties are established before resorting to groupings containing three whole, contiguous counties, and so on. As shown by the charts provided by defendants, plaintiffs have not produced an alternative plan that better complies with a correct reading of *Stephenson I*'s fifth and sixth factors than the plans enacted by the General Assembly. Because the enacted plans result in groupings containing fewer whole, contiguous counties than do any of plaintiffs' plans, we need not discuss the number of counties divided or county lines traversed.

In addition, the maps that plaintiffs employ to support their arguments regarding the Whole County Provision are not helpful because they are premised upon a flawed understanding of our holding in *Pender County*. In that case, we held that the first *Gingles* precondition can be shown only where the minority population is fifty percent plus one of the Total Black Voting Age Population. *Pender Cnty.*, 361 N.C. at 502, 649 S.E.2d at 371 (The "minority group must constitute a numerical majority of the voting population in the area under consideration before Section 2 of the VRA requires the creation of a legislative district to prevent dilution of the votes of that minority group."). Here, as did the plaintiffs in *Pender County*, *see id.* at 502-03, 649 S.E.2d at 371-72, plaintiffs argue that we should adopt a standard that allows VRA requirements to be satisfied by other forms of minority districts, such as coalition and crossover districts. Not only is plaintiffs' argument inconsistent with our holding in *Pender County*, this flawed approach adversely affects the first step of the process required by *Stephenson I*, the formation of VRA districts. As a result, plaintiffs' maps are distorted *ab initio* and the distortion is compounded at each subsequent step. Consequently, even if plaintiffs' proposed alternative plans were comparable to the enacted plans in terms of the number and composition of county groupings, their incompatibility with *Pender County* means that they cannot serve as an adequate basis for comparison with the enacted plans.

Plaintiffs have also compared the General Assembly's enacted plans with earlier redistricting plans approved in North Carolina. However, those plans were

tailored to a particular time and were based upon then-existing census numbers and population concentrations.  The requirement that the State maintain its one-person, one-vote standard as populations shift makes comparisons between current and previous districting plans of limited value.  The utility of prior plans is further diminished by subsequent clarifications of the legal standards in effect when these earlier plans were promulgated.  *See, e.g., Pender Cnty.*, 361 N.C. at 503-04, 649 S.E.2d at 372 (explaining the requirements of the first *Gingles* precondition).  As a result, no meaningful comparisons can be made in this case.

Separately, plaintiffs argue that this Court should consider the purported lack of compactness of the districts created by the General Assembly and the harm resulting from splitting precincts.  While these are valid considerations and may be evidence of other legal infirmities, neither constitutes an independent legal basis for finding a violation, and we are unaware of any justiciable standard by which to measure these factors.

Finally, plaintiffs argue that the enacted plans violate the "Good of the Whole" clause found in Article I, Section 2 of the Constitution of North Carolina.  We do not doubt that plaintiffs' proffered maps represent their good faith understanding of a plan that they believe best for our State as a whole.  However, the maps enacted by the duly elected General Assembly also represent an equally legitimate understanding of legislative districts that will function for the good of the whole.  Because plaintiffs' argument is not based upon a justiciable standard, and

because acts of the General Assembly enjoy "a strong presumption of constitutionality," *Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam) (citation omitted), plaintiffs' claims fail.

We agree with the unanimous three-judge panel that the General Assembly's enacted plans do not violate plaintiffs' constitutional rights. We hold that the enacted House and Senate plans satisfy state and federal constitutional and statutory requirements. Accordingly, we affirm the trial court.

AFFIRMED.

Justice HUNTER did not participate in the consideration or decision of this case.

Justice BEASLEY concurring in part and dissenting in part.

I agree with the majority's holding with respect to plaintiffs' challenge under the "Good of the Whole" Clause in Article I, Section 2 of the Constitution of North Carolina. Nonetheless, because the twenty-six VRA districts at issue and two of the four non-VRA districts were created in direct contradiction to federal and state provisions, this Court should vacate the trial court's judgment and remand the matter to the lower court for proper findings of fact and conclusions of law. I therefore respectfully dissent. Furthermore, there are several points of error, any of which would warrant vacating and remanding. With respect to the VRA districts, the record supports the trial court's conclusions that the VRA districts were drawn with race as the predominant motive and that strict scrutiny applies. Contrary to the conclusions reached by the trial court and the majority, however, these districts fail strict scrutiny. With respect to the non-VRA districts, the trial court's findings do not support its conclusions that race was not the predominant motive for the drafting of Senate District 32 and Congressional District 12. Because the shape and composition of invalid districts necessarily affect other districts, the redistricting plan at issue violates the Whole County Provisions set forth in Article II, Sections 3(3) and 5(3) of the Constitution of North Carolina.

**I.**

Though this honorable Court wishes to achieve finality in this appeal, the citizens of this state would be better served by this Court if we held our usual course and vacated and remanded the case to the trial court for proper findings of fact and conclusions of law based upon a correct interpretation of the law. I disagree with the majority's assertion that doing so "would achieve nothing but delay" because "the panel has already conducted its analysis under th[e] [strict scrutiny] standard." In its analysis the trial court incorrectly stated and applied the standard. At a minimum, proper findings, once made, would better illuminate defendants' actions in view of the appropriate constitutional tests and would provide a better basis for proper review by this Court, potential consideration by the Supreme Court of the United States, and assessment by the citizens of North Carolina of our General Assembly's actions and this Court's decision.

In reaching its conclusions, the trial court misapplied precedent from this Court and the Supreme Court of the United States. The majority compounds the error by ignoring altogether the trial court's explicit findings of fact and by too generously characterizing the General Assembly's enacted plan. The majority's departure from this Court's usual course of adherence to our settled principles of appellate review could create a stain of suspicion among the citizens of the state regarding the actions of their elected officials and bodies of government—both legislative and judicial. *See, e.g.*, *State v. Carter*, 322 N.C. 709, 722, 370 S.E.2d 553,

560 (1988) ("[W]e regard the crucial matter of the integrity of the judiciary . . . to be [a] paramount consideration[ ].").

## II.

Contrary to the majority's opinion, the trial court correctly concluded that strict scrutiny applies; however, the trial court incorrectly articulated the standard and therefore improperly applied its findings of fact to the standard. Of particular concern is the trial court's finding that the General Assembly's use of "rough proportionality" as a redistricting "benchmark" survives strict scrutiny. This misstep is fatal to the VRA districts and consequently affects the legitimacy of non-VRA districts drawn in view of the Whole County Provisions. Although this Court should vacate and remand for reconsideration in light of correct principles, the majority attempts to cure the trial court's errors and prematurely affirm an incomplete and incorrect judgment. As stated above, it would be impractical to vacate and remand piecemeal because the invalidity of at least one House, Senate, or Congressional district would necessarily compromise the shape and composition of the remaining districts in the affected group or groups.

## A.

It is well established that "all laws that classify citizens on the basis of race, including racially gerrymandered districting schemes, are constitutionally suspect

and must be strictly scrutinized." *Hunt v. Cromartie*, 526 U.S. 541, 546, 119 S. Ct. 1545, 1548-49, 143 L. Ed. 2d 731, 737-38 (1999) ("*Cromartie I*") (citations omitted). "This is true whether or not the reason for the racial classification is benign or the purpose remedial." *Shaw v. Hunt*, 517 U.S. 899, 904-05, 116 S. Ct. 1894, 1900, 135 L. Ed. 2d 207, 218 (1996) ("*Shaw II*") (citations omitted). Yet, "[a]pplying traditional equal protection principles in the voting-rights context is 'a most delicate task' . . . because a legislature may be conscious of the voters' races without using race as a basis for assigning voters to districts." *Id*. at 905, 116 S. Ct. at 1900, 135 L. Ed. 2d at 218 (quoting *Miller v. Johnson*, 515 U.S. 900, 905, 115 S. Ct. 2475, 2483, 132 L. Ed. 2d 762, 772 (1995)). Only "when race becomes the 'dominant and controlling' consideration" is the right to equal protection jeopardized. *Id*. (quoting *Miller*, 515 U.S. at 913, 115 S. Ct. at 2486, 132 L. Ed. 2d at 777).

The burden to make this showing falls to the plaintiff:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Miller*, 515 U.S. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779-80.

If the plaintiff satisfies this initial burden of production, the redistricting legislation "cannot be upheld unless it satisfies strict scrutiny, [the] most rigorous and exacting standard of constitutional review."[9]  *Id.* at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782.  Once strict scrutiny review is triggered, the burden shifts to the State to "show not only that its redistricting plan was in pursuit of a compelling state interest, but also that 'its districting legislation is narrowly tailored to achieve [that] compelling interest.' "  *Shaw II*, 517 U.S. at 908, 116 S. Ct. at 1902, 135 L. Ed. 2d at 220-21 (alteration in original) (quoting *Miller*, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782).

Here, while acknowledging the fact-intensive nature of the examination into whether race was the predominant factor motivating the legislature's redistricting decision, the trial court believed that it was "able to by-pass this factual inquiry" for the twenty-six VRA districts:

> The Plaintiffs collectively challenge as racial gerrymanders 9 Senate, 18 House and 3 U.S. Congressional districts created by the General Assembly in the Enacted Plans.  Of those 30 challenged districts, it is undisputed that the General Assembly intended to create 26 of the challenged districts to be "Voting Rights Act districts" [hereinafter "VRA districts"] and that it set

---

[9] "If, however, [the] plaintiff[ ] cannot show that race was the 'predominant factor' to which traditional districting principles were 'subordinated,' and thus cannot meet the threshold for triggering strict scrutiny, it follows that the facially neutral classification (the electoral district) will be subject, at most, to rational basis review."  *Quilter v. Voinovich*, 981 F. Supp. 1032, 1050 (N.D. Ohio 1997) (citing *Miller*, 515 U.S. at 915-16, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779-80), *aff'd*, 523 U.S. 1043, 118 S. Ct. 1358, 140 L. Ed. 2d 508 (1998).

about to draw each of these VRA districts so as to include at least 50% Total Black Voting Age Population [hereinafter "TBVAP"]. Moreover, the General Assembly acknowledges that it intended to create as many VRA districts as needed to achieve a "roughly proportionate" number of Senate, House and Congressional districts as compared to the Black population in North Carolina. To draw districts based upon these criteria necessarily requires the drafters of districts to classify residents by race so as to include a sufficient number of black voters inside such districts, and consequently exclude white voters from the districts, in an effort to achieve a desired racial composition of >50% TBVAP and the desired "rough proportionality." This is a racial classification.

(footnote call numbers omitted). Accordingly, the trial court "conclude[d] . . . that in drawing [the] VRA districts . . . [,] the shape, location and racial composition of each VRA district was predominantly determined by a racial objective and was the result of a racial classification sufficient to trigger the application of strict scrutiny as a matter of law."

The majority explains that

> [b]ecause of the trial court's truncated findings of fact [as to whether race was "the General Assembly's predominant motivation in forming the twenty-six VRA districts"], we do not know which other factors may have influenced the creation and shape of these twenty-six districts and the extent of any such influence. As a result, we do not know whether race fairly can be described as the predominant factor in the formation of these districts and whether, in turn, strict scrutiny was the appropriate standard of review.

The majority then analyzes the case as if strict scrutiny applies. This Court should remand for the trial court to clarify the full basis for its conclusion that plaintiffs have met their burden to show that race was the predominant factor. The record provides substantial evidence and the Supreme Court of the United States provides clear guidance on this point. Furthermore, as discussed below, the trial court's subsequent findings with regard to proportionality inescapably lead to the conclusion that race was the predominant factor, thereby requiring strict scrutiny.

Plaintiffs and *amici* point to evidence showing that State Senator Robert Rucho and State Representative David Lewis, the respective chairs of the Senate and House Redistricting Committees, instructed Dr. Thomas Hofeller, the "chief architect" of the redistricting plans, to draw the plans to provide "substantial proportional[ity]" between the percentage of the state's population that is Black and the percentage of districts that would be majority Black. Dr. Hofeller was also told to "draw a 50% plus one district wherever in the state there is a sufficiently compact black population" to do so. The public statements released by Senator Rucho and Representative Lewis also reflect these legislative goals, saying that, in order to comply with VRA section 2, the VRA districts are designed to provide Black voters with "substantial proportionality" and "must be established with a BVAP of 50% plus one." As stated particularly well by the *amici* election law professors, this "undisputed, direct evidence" demonstrates the legislature's intent to "creat[e] a certain number of majority-minority districts and then pack[ ] the maximum

number of black voters possible into the districts."[10]  This evidence and the

arguments advanced by plaintiffs and *amici* underscore the trial court's error in

"by-pass[ing] [its] factual inquiry."

The Supreme Court of the United States has found similar evidence to be

sufficient to trigger strict scrutiny of the redistricting plans.  *See, e.g., Bush v. Vera*,

517 U.S. 952, 958-59, 116 S. Ct. 1941, 1951-52, 135 L. Ed. 2d 248, 257 (1996)

(plurality) (explaining that strict scrutiny applies when race is "the predominant

factor" in a legislature's redistricting plan) (citation, emphasis, and quotation marks

omitted); *Id.* at 1002, 116 S. Ct. at 1974, 135 L. Ed. 2d at 286 (Thomas & Scalia, JJ.,

concurring in the judgment) (explaining that Texas's admission that "it

intentionally created majority-minority districts" to comply with the VRA was

"enough to require application of strict scrutiny in this suit"); *Shaw II*, 517 U.S. at

906, 116 S. Ct. at 1901, 135 L. Ed. 2d at 219 (applying strict scrutiny after "fail[ing]

to see how" a court could "reach[ ] any conclusion other than that race was the

predominant factor in" the General Assembly's drawing of redistricting lines when

---

[10] "Packing" is one means of diluting minority voting strength.  For example, "[a] minority group . . . might have sufficient numbers to constitute a majority in three districts. So apportioned, the group inevitably will elect three candidates of its choice, assuming the group is sufficiently cohesive.  But if the group is packed into two districts in which it constitutes a super-majority, it will be assured only two candidates." *Voinovich v. Quilter*, 507 U.S. 146, 153-54, 113 S. Ct. 1149, 1155, 122 L. Ed. 2d 500, 511 (1993).  In contrast to packing, minority voting strength may also be diluted by what is known as "cracking": "A politically cohesive minority group that is large enough to constitute the majority in a single-member district has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority.  Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice . . . ." *Id.* at 153, 113 S. Ct. at 1155, 122 L. Ed. 2d at 511.

the State admitted that its "overriding" purpose was to obtain preclearance from DOJ (citation, emphasis, and quotation marks omitted)); *Miller*, 515 U.S. at 919, 115 S. Ct. at 2490, 132 L. Ed. 2d at 781 (concluding that Georgia's express desire to obtain preclearance was "powerful evidence that the legislature subordinated traditional districting principles to race when it ultimately enacted a plan creating three majority-black districts" and thus strict scrutiny applied). Accordingly, in view of *Vera*, *Shaw II*, and *Miller*, the trial court in this case correctly concluded that strict scrutiny is the appropriate level of review to apply to the enacted plans.

Nonetheless, the trial court improperly applied the standard. In its decision the trial court states that if plaintiffs meet the threshold burden of establishing that "race was the overriding consideration behind a redistricting plan,"

> the state then has the burden of "producing evidence that the plan's use of race is narrowly tailored to further a compelling state interest, and the plaintiffs bear the ultimate burden of persuading the court either that the proffered justification is not compelling or that the plan is not narrowly tailored to further it." *Shaw v. Hunt*, 861 F. Supp. 408, 436 (E.D. N.C. 1994).

In support of this proposition, the trial court quotes the district court's decision in *Shaw II*. In *Shaw II*, however, the Supreme Court of the United States reversed the trial court and, in doing so, held that under strict scrutiny, "*North Carolina . . . must show* not only that its redistricting plan was in pursuit of a compelling state interest, but also that 'its districting legislation is narrowly tailored to achieve

[that] compelling interest.' " 517 U.S. at 908, 116 S. Ct. at 1902, 135 L. Ed. 2d at 220-21 (alteration in original) (emphasis added) (quoting *Miller*, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782). This language from *Shaw II* clearly places the burden of proof on the State once strict scrutiny is triggered.

This conclusion is bolstered by the Supreme Court's earlier statement in *Miller* that, "[t]o satisfy strict scrutiny, *the State must demonstrate* that its districting legislation is narrowly tailored to achieve a compelling interest." 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782 (emphasis added) (citations omitted). More recently, in the affirmative action context, the Supreme Court has been more explicit on this point: Under strict scrutiny, "*it remains at all times the [government]'s obligation to demonstrate*, and the Judiciary's obligation to determine" that the challenged action is narrowly tailored to achieve a compelling governmental interest. *Fisher v. Univ. of Tex. at Austin*, ___ U.S. ___, ___, 133 S. Ct. 2411, 2420, 186 L. Ed. 2d 474, 486-87 (2013) (emphasis added).

Here the trial court attempted to distinguish *Fisher* on the ground that the General Assembly is entitled to some degree of deference given that redistricting is "an inherently political process." The Supreme Court, however, has declined to defer to political decision makers and apply something less than strict scrutiny to race-based classifications:

> But we have refused to defer to state officials' judgments
> on race in . . . areas where those officials traditionally
> exercise substantial discretion.  For example . . . . in the
> redistricting context, despite the traditional deference
> given to States when they design their electoral districts,
> we have subjected redistricting plans to strict scrutiny
> when States draw district lines based predominantly on
> race.

*Johnson v. California*, 543 U.S. 499, 512, 125 S. Ct. 1141, 1150, 160 L. Ed. 2d 949, 962-63 (2005) (citations omitted); *accord Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,  551 U.S. 701, 744, 127 S. Ct. 2738, 2766, 168 L. Ed. 2d 508, 539 (2007) (plurality) (explaining that "deference is fundamentally at odds with our equal protection jurisprudence" and that courts "put the burden on state actors to demonstrate that their race-based policies are justified" (citations and quotation marks omitted)).  Moreover, to whatever extent the legislature may be entitled to deference, that "limited degree of leeway in furthering [its] interests" in complying with the VRA relates to whether the State has met its burden of establishing "the 'narrow tailoring' requirement of strict scrutiny."  *Vera*, 517 U.S. at 977, 116 S. Ct. at 1960, 135 L. Ed. 2d at 268 (plurality).  Nonetheless, the State is not relieved of "the *burden to prove* 'that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate.' "  *Fisher*, ___ U.S. at ___, 133 S. Ct. at 2419, 186 L. Ed. 2d at 485 (alterations in original) (emphasis added) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505, 109 S. Ct. 706, 728, 102 L. Ed. 2d 854, 889 (1989)).

Thus, the trial court's misunderstanding and misapplication of the strict scrutiny analytical framework should warrant this Court's vacating the trial court's decision and remanding for reconsideration in light of correct principles. *See id.* at ___, 133 S. Ct. at 2421, 186 L. Ed. 2d at 488 (remanding after determining that the trial court and court of appeals misapplied strict scrutiny standard to enable challenged admissions policy to "be considered and judged under a correct analysis"). Failure to apply properly the operative constitutional test is, in itself, a sufficient basis for overturning the trial court's decision. *See id.*

**B.**

I turn next to address the invalidity of the twenty-six VRA districts. In view of the appropriate strict scrutiny standard, assuming that the state had a compelling interest in avoiding liability under VRA section 2 and obtaining preclearance under VRA section 5,[11] and assuming that the factors set forth in *Thornburg v. Gingles* are met, the trial court's findings with respect to proportionality do not support its ultimate conclusion that the redistricting plans pass strict scrutiny. Therefore, this Court should vacate and remand regarding the twenty-six VRA districts.

---

[11] The United States Supreme Court has repeatedly assumed without deciding that compliance with the VRA can be a compelling state interest in the strict scrutiny context, but the Court has not expressly decided the issue. *See Shaw II*, 517 U.S. at 915, 116 S. Ct. at 1905, 135 L. Ed. 2d at 225 ("We assume, *arguendo*, for the purpose of resolving this suit, that compliance with § 2 could be a compelling interest . . . ."); *Miller*, 515 U.S. at 921, 115 S. Ct. at 2490-91, 132 L. Ed. 2d at 782 (assuming that satisfying "the Justice Department's preclearance demands" can be a compelling interest).

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986), the Supreme Court set forth three "necessary preconditions" for a vote-dilution claim brought under VRA section 2:  the minority group must be able to demonstrate that (1) it is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) it is "politically cohesive"; and (3) the majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Id.* at 50-51, 106 S. Ct. at 2766-67, 92 L. Ed. 2d at 46-47 (citations omitted).  "In a § 2 case, only when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances."  *Bartlett v. Strickland*, 556 U.S. 1, 11-12, 129 S. Ct. 1231, 1241, 173 L. Ed. 2d 173, 182 (2009) (plurality) (citations omitted).  "While . . . proportionality is not dispositive in a [districting challenge], it is a relevant fact in the totality of circumstances to be analyzed . . . ."  *Johnson v. De Grandy*, 512 U.S. 997, 1000, 114 S. Ct. 2647, 2651, 129 L. Ed. 2d 775, 784 (1994).

Here, in considering whether the General Assembly's plan was narrowly tailored, the trial court reviewed, *inter alia*, defendants' Memorandum of Law in Support of their Motion for Summary Judgment.  Defendants' Memorandum states:

> [d]efendants freely admit three principles followed by them in drawing the enacted legislative plans:
>
> . . . .

3. that the General Assembly would explore the possibility of establishing a sufficient number of VRA legislative districts to provide African-American voters with rough proportionality in the number of VRA districts in which they have reasonable opportunity to elect their candidates of choice.

Defendants further state that they "increased the number of VRA districts to provide African American voters with rough proportionality in the number of districts in which they can elect candidates of choice."

After reviewing defendants' Memorandum and other materials, the trial court entered its judgment explaining the General Assembly's use of proportionality in redrawing its district plans as follows:

> *The undisputed evidence establishes that the General Assembly, in drafting the Enacted Plans, endeavored to create VRA districts in roughly the same proportion as the ratio of Black population to total population in North Carolina.* In other words, because the 2010 census figures established that 21% of North Carolina's population over 18 years of age was "any part Black," the corresponding rough proportion of Senate seats, out of 50 seats, would be 10 seats, and hence 10 VRA Senate districts. Likewise, of the 120 House seats, 21% of those seats would be roughly 25 House seats, and hence 25 VRA districts.
>
> The General Assembly, in using "rough proportionality" as a *benchmark* for the number of VRA districts it created in the Enacted Plans, relies upon Supreme Court precedent that favorably endorses "rough proportionality" as a means by which a redistricting plan can provide minority voters with an equal opportunity to elect candidates of choice. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429-30 (2006) [hereinafter *LULAC*]; *Shaw II*, 517 U.S. at 916 n.8; *De Grandy*, 512

> U.S. at 1000. In *De Grandy*, the Supreme Court said that "no violation of § 2 can be found . . . , where, in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." 512 U.S. at 1013-1015. Where a State's election districts reflect substantial proportionality between majority and minority populations, the Supreme Court explained, such districts would "thwart the historical tendency to exclude [the minority population], not encourage or perpetuate it." *Id.* at 1014. It is reasonable for the General Assembly to rely upon this unequivocal holding of the Supreme Court in drafting a plan to avoid § 2 liability. When the Supreme Court says "no violation of § 2 can be found" under certain circumstances, prudence dictates that the General Assembly should be given the leeway to seek to emulate those circumstances in its Enacted Plans.

(ellipsis in original) (emphases added) (footnote call number omitted). The trial court concluded that achieving rough proportionality was "not inconsistent with the General Assembly's obligation to narrowly tailor the plans under strict scrutiny." Although the trial court correctly cited the holding in *De Grandy*, the case does not support the trial court's conclusion.

In *De Grandy* the Florida legislature drew majority-minority districts roughly proportionate in number to the minorities' share of the total Florida population. While the Supreme Court held that such redistricting did not violate VRA section 2, the Court explicitly rejected the state's proposed rule that "rough proportionality" would always immunize the state from VRA section 2 liability, stating:

> [W]e reject the safe harbor rule because of . . . a tendency to promote and perpetuate efforts to devise majority-minority districts even in circumstances where they may not be necessary to achieve equal political and electoral opportunity. Because in its simplest form the State's rule would shield from § 2 challenge a districting scheme in which the number of majority-minority districts reflected the minority's share of the relevant population, the conclusiveness of the rule might be an irresistible inducement to create such districts. It bears recalling, however, that for all the virtues of majority-minority districts as remedial devices, they rely on a quintessentially race-conscious calculus aptly described as the "politics of second best."

*Id.* at 1019-20, 114 S. Ct. at 2661, 129 L. Ed. 2d at 796 (citation omitted); *see also id.* at 1025, 114 S. Ct. at 2664, 129 L. Ed. 2d at 799 (O'Connor, J., concurring) (Proportionality, while "*always* relevant," is "*never* itself dispositive."). Further, "the most blatant racial gerrymandering in half of a county's single-member districts would be irrelevant under § 2 if offset by political gerrymandering in the other half, so long as proportionality was the bottom line." *Id.* at 1019, 114 S. Ct. at 2661, 129 L. Ed. 2d at 796 (majority) (citations omitted). Thus, the Supreme Court admonished that an "inflexible rule" permitting the use of rough proportionality as a safe harbor "would run counter to the textual command of § 2, that the presence or absence of a violation be assessed 'based on the totality of circumstances.' The need for such 'totality' review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power . . . ." *Id.* at 1018, 114 S. Ct. at 2660, 129 L. Ed. 2d at 795 (citations omitted).

A state legislature is thus required to determine whether *each* majority-minority district is reasonably necessary to afford minorities equal political and electoral opportunity. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 437, 126 S. Ct. 2594, 2620-21, 165 L. Ed. 2d 609, 643 (2006) (explaining that "proportionality" may not "displace" the "intensely local appraisal" of each challenged district (internal quotation marks omitted) (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. at 2781, 92 L. Ed. 2d at 65)). Here, however, defendants' public statements undermine their adherence to the applicable standards and demonstrate the central role proportionality played in the 2011 redistricting plan. On 17 June 2011, defendants announced a public hearing on the matter, in which defendants sought redistricting plans with a sufficient number of majority-minority districts to provide substantial proportionality. Defendants recommended "that each plan include a sufficient number of majority African American districts to provide North Carolina's African American citizens with a substantially proportional and equal opportunity to elect their preferred candidate of choice." Defendants explained that "proportionality for the African American citizens in North Carolina means the creation of 24 majority African American House districts and 10 majority Senate districts. . . . Unlike the 2003 benchmark plans, the Chairs' proposed 2011 plans will provide substantial proportionality for North Carolina's African American citizens."

Notwithstanding, based on its misreading of *De Grandy*, the trial court cites approvingly defendants' use of proportionality as the "benchmark" for creating the enacted plan—beginning with proportionality as the goal and then working backwards to achieve that goal. Similarly, the trial court reasoned: "When the Supreme Court says 'no violation of § 2 can be found' under certain circumstances, prudence dictates that the General Assembly should be given the leeway to seek to emulate those circumstances in its Enacted Plans." (quoting *De Grandy*, 512 U.S. at 1000, 114 S. Ct. at 2651, 129 L. Ed. 2d at 784). But this is precisely what the Supreme Court rejected in *De Grandy*: proportionality is relevant as a *means* to an end (compliance with the VRA), but it is not an *end* in itself and it does not—contrary to the trial court's reasoning—provide a safe harbor for redistricting plans premised on race. The trial court's misunderstanding of the applicable law permeates its analysis of the narrow tailoring requirement and leads it incorrectly to conclude that defendants' use of proportionality as an end is constitutionally permissible.

The majority states that "the trial court analyzed whether the legislature used proportionality in the enacted plans improperly to 'link[ ] the number of majority-minority voting districts to minority members' share of the relevant population.'" (alteration in original) (citation omitted). After setting forth various standards and principles, the majority summarily concludes that "the record here demonstrates that the General Assembly did not use proportionality improperly to

guarantee the number of majority-minority voting districts based on the minority members' share of the relevant population." The majority is only able to draw this conclusion by ignoring the trial court's determination—based upon "the undisputed evidence"—that the General Assembly used proportionality as a "benchmark." The majority's conclusion becomes more confusing when the majority states, "We believe that such an effort, seeking to guarantee proportional representation, proportional success, or racial balancing, would run afoul of the Equal Protection Clause." (citing *De Grandy*, 512 U.S. at 1017-22, 114 S. Ct. at 2660-62, 129 L. Ed. 2d at 794-98). I agree "that such an effort . . . would run afoul of the Equal Protection Clause," and it does here. In view of defendants' public statements, defendants' Memorandum of Law to the trial court, the undisputed evidence before the trial court, and the trial court's unqualified finding that the legislature used proportionality as a "benchmark" for its redistricting plans, the majority's attempt to explain otherwise is unconvincing and runs afoul of the United States Supreme Court's warnings in *De Grandy*.

By characterizing the General Assembly's consideration of race as a "prophylactic consideration" used "as a means of inoculating the redistricting plans against potential legal challenges under section 2's totality of the circumstances test," the majority compounds the trial court's error and purports to establish the use of race as a legislative safe harbor in derogation of the clear prohibition against such use set forth by the Supreme Court of the United States. *De Grandy*, 512 U.S.

at 1018-20, 114 S. Ct. at 2660-61, 129 L. Ed. 2d at 795-97. In light of these errors, this Court should vacate the trial court's order and remand the case for reconsideration under a correct understanding of the law.

## C.

With respect to the four non-VRA districts, plaintiffs challenge the trial court's determination that "race was not the predominant motive in the creation of" Senate District 32 and Congressional District 12. "The legislature's motivation is itself a factual question," *Cromartie I*, 526 U.S. at 549, 119 S. Ct. at 1550,143 L. Ed. 2d at 740, and a trial court's findings resolving factual issues in a nonjury trial are binding on appeal "if there is competent evidence to support them, even though the evidence could be viewed as supporting a different finding," *Stephenson v. Bartlett*, 357 N.C. 301, 309, 582 S.E.2d 247, 252 (2003) ("*Stephenson II*") (citation and quotation marks omitted).

### i.

Looking first at Senate District 32, plaintiffs contend that the trial court's findings actually undermine its conclusion that strict scrutiny does not apply because the districts are not race-based. The trial court found the following relevant facts:

> 204. As was true under the 2000 Census, under the 2010 Census there is insufficient TBVAP in Forsyth

County to draw a majority-TBVAP Senate district in Forsyth County. However, because of concerns regarding the State's potential liability under § 2 and § 5, Dr. Hofeller was instructed by the redistricting chairs to base the 2011 Senate District 32 on the 2003 versions of Senate District 32.

. . . .

207. The first version of Senate District 32 that was released by the General Assembly had a TBVAP of 39.32%. Subsequently, the SCSJ plan was released. Its version of District 32 was located in a three-county and three-district group (Forsyth, Davie, Davidson). The SCSJ District 32 had a TBVAP of 41.95%. The SCSJ District 32 was a majority-minority coalition district with a non-Hispanic white population of 43.18%.

208. The redistricting chairs were concerned that any failure to match the TBVAP % found in the SCSJ District 32 could potentially subject the state to liability under § 2 or § 5 of the VRA. Therefore, Dr. Hofeller was instructed by the Redistricting Chairs to re-draw the State's version of Senate District 32 so that it would at least equal the SCSJ version in terms of TBVAP.

As discussed above, the Supreme Court of the United States has held that when redistricting plans drawn in an attempt to preempt VRA section 2 litigation or obtain VRA section 5 preclearance are predominantly race-based, such plans attract strict scrutiny. *See Vera*, 517 U.S. at 959, 116 S. Ct. at 1951-52, 135 L. Ed. 2d at 257; *Shaw II*, 517 U.S. at 906-07, 116 S. Ct. at 1901, 135 L. Ed. 2d at 219-20; *Miller*, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782.

The trial court acknowledged that compliance with the VRA was a motivating factor behind the enacted plans, but concluded that "comply[ing] with the Whole

County Provision, . . . equaliz[ing] population among the districts, . . . protect[ing] incumbents, and . . . satisfy[ing] the General Assembly's desire to enact redistricting plans that were more competitive for Republican candidates" were "equally dominant legislative motivations." Notwithstanding, in the section of its fact-finding order addressing Senate District 32, the trial court made no findings regarding these other considerations. While the evidence might support such a conclusion, the trial court's actual findings do not. Accordingly, this Court should vacate and remand on the issue of whether race was the predominant motivation behind the shape, location, and composition of Senate District 32.

**ii.**

With respect to Congressional District 12, the trial court's findings belie a fundamental problem with redistricting, particularly in North Carolina, the importance of which cannot be overstated. In *Easley v. Cromartie*, 532 U.S. 234, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001), the Supreme Court of the United States observed that "racial identification correlates highly with political affiliation" in North Carolina. *Id.* at 258, 121 S. Ct. at 1466, 149 L. Ed. 2d at 453. As such, the plaintiffs in that case "ha[d] not successfully shown that race, rather than politics, predominantly account[ed] for" the shape, location, and composition of the 1997 version of Congressional District 12. *Id.* at 257, 121 S. Ct. at 1466, 149 L. Ed. 2d at 453. Because race and politics historically have been and currently remain

intertwined in North Carolina, I cannot escape my conviction that politics are a pretext for this excruciatingly contorted race-based district. Therefore, the trial court incorrectly concluded that "the shape, location and composition of [this district] . . . included equally dominant legislative motivations . . . to protect incumbents[ ] and to . . . enact redistricting plans that were more competitive for Republican candidates." To allow this serpentine district, which follows the I-85 corridor between Mecklenburg and Guilford Counties, to be drafted for political advantage is a proxy for racial disenfranchisement and effectively creates a "magic words" threshold. Upholding this district's tortured construction creates an incentive for legislators to stay "on script" and avoid mentioning race on the record, and in this instance, it is disingenuous to suggest that race is not the predominant factor. As such, this Court should vacate and remand as to Congressional District 12.

**iii.**

With respect to House District 54 and Congressional District 4, the trial court also found that race was not the predominant motivating factor. Plaintiffs do not contest these determinations, and they are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). As stated above, however, because the shapes and compositions of the four non-VRA districts are necessarily

affected by the VRA districts, it would be impossible to vacate and remand piecemeal.

**D.**

With respect to the Whole-County Provisions ("WCP"), plaintiffs contend that the trial court erred in concluding that the enacted house and senate plans do not violate the provisions of the state constitution, which dictate that "[n]o county shall be divided in the formation of a senate district," N.C. Const. art. II, § 3(3), and "[n]o county shall be divided in the formation of a representative district," *id.* art. II, § 5(3). In *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) ("*Stephenson I*"), this Court construed the WCP in light of federal law and "mandated that in creating legislative districts, counties shall not be divided except to the extent necessary to comply with federal law, including the 'one-person, one-vote' principle and the VRA." *Stephenson II,* 357 N.C. at 309, 582 S.E.2d at 251-52 (citing *Stephenson I*, 355 N.C. at 363-64, 562 S.E.2d at 384-85). To ensure complete compliance with federal law and to provide maximum enforcement of the WCP, this Court "outlined in *Stephenson I* the following requirements that must be present in any constitutionally valid redistricting plan:"

> [1.] . . . [T]o ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts. . . . In the formation of VRA districts within the revised redistricting plans on remand, we likewise direct the trial court to

ensure that VRA districts are formed consistent with federal law and in a manner having no retrogressive effect upon minority voters. *To the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP, as herein established . . . .*

[2.] In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal "one-person, one-vote" requirements.

[3.] In counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district . . . , the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county.

[4.] When two or more non-VRA legislative districts may be created within a single county, . . . single-member non-VRA districts shall be formed within said county. *Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.*

[5.] In counties having a non-VRA population pool which cannot support at least one legislative district . . . or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the . . . "one-person, one-vote" standard, the requirements of the WCP are met by combining or grouping the *minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping*; provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-

county grouping but only to the extent necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard.

[6.] The intent underlying the WCP must be enforced to the maximum extent possible; thus, *only the smallest number of counties necessary to comply with the at or within plus or minus five percent "one-person, one-vote" standard shall be combined*[.]

[7.] . . . *[C]ommunities of interest should be considered in the formation of compact and contiguous electoral districts.*

[8.] . . . [M]ulti-member districts shall not be used in the formation of legislative districts unless it is established that such districts are necessary to advance a compelling governmental interest.

[9.] Finally, we direct that any new redistricting plans, including any proposed on remand in this case*, shall depart from strict compliance with the legal requirements set forth herein only* to the extent necessary to comply with federal law.

*Stephenson II*, 357 N.C. at 305-07, 582 S.E.2d at 250-51 (alterations in original) (quotation marks omitted) (quoting *Stephenson I*, 355 N.C. at 383-84, 562 S.E.2d at 396-97 (emphasis added)).

In view of my analysis concerning plaintiffs' equal protection claim, the WCP issue also warrants remanding the case because the General Assembly, in attempting to comply with *Stephenson I's* Rule 1, drew the VRA districts before applying Rules 2 through 9. Because I conclude that the VRA districts are unconstitutional, this Court should instruct the General Assembly to redraft its redistricting plans. The unconstitutional VRA districts would necessarily affect the

result of the General Assembly's application of the rubric set forth in *Stephenson I.*
*See Pender Cnty. v. Bartlett*, 361 N.C. 491, 508-09, 649 S.E.2d 364, 375 (2007)
(concluding that a house district, created with the intent to comply with VRA
section 2, was not required by the VRA and thus "must be drawn in accordance with
the WCP and the *Stephenson I* requirements"), *aff'd sub nom. Bartlett v. Strickland*,
556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009). As such, I would vacate and
remand on this issue.

### E.

Having carefully considered the precedent established by the Supreme Court
of the United States, the decisions of this Court, and the record on appeal, it is
important to recognize that race can be used as a factor fairly, but it equally
important to emphasize that race must not be used punitively. To this end, it is
important to be cognizant of race, not only in view of the historical record of our
state and our nation, but also taking into account modern realities and future
possibilities. It is for this reason that I note my concern with the majority's
statement that "no meaningful comparisons can be made" with "earlier redistricting
plans approved in North Carolina" because "those plans were tailored to a
particular time and were based upon then-existing census numbers and population
concentrations." Some comparisons may be of limited value, but increasingly
sophisticated data processing and modes of visual representation may provide

helpful comparisons among past, present, and proposed districts in view of past and present population concentrations. It would be a disservice to North Carolina's citizens and our courts if the majority's statements are read to foreclose without qualification any meaningful comparisons with earlier approved plans.

## III.

As discussed above, the trial court erred by making incomplete findings of fact and conclusions of law. Further, even using the findings as made by the trial court, the court's judgment discloses several serious misapplications of law, which led the court to erroneous conclusions of law. There can be no serious debate that strict scrutiny applies in view of the General Assembly's use of race as a benchmark for measuring the redistricting plan. The VRA districts are fatally defective in view of the legislature's use of racial proportionality as a safe harbor, and the invalidity of these districts necessarily renders invalid the entire plan under settled federal constitutional standards announced by the Supreme Court of the United States. Similarly, the trial court's findings regarding the non-VRA districts do not support its conclusions. Furthermore, these impermissibly racially gerrymandered districts fail under the Whole County Provision of the North Carolina Constitution. For any of these errors, this Court would do well to vacate and remand rather than prematurely affirm a defective and ultimately undemocratic districting plan.

Accordingly, I concur in that part of the majority's opinion regarding plaintiffs' remaining state claims related to the "Good of the Whole" Clause in Article I, Section 2 of the Constitution of North Carolina, and respectfully dissent from those parts of the opinion affirming the trial court's erroneous judgment.

Justice HUDSON joins in this opinion.